SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-SION, Rail Services Planning Office, Respondent,

Consolidated Rail Corporation, Intervenor.

No. 77–2520.

United States Court of Appeals, Third Circuit.

Argued Sept. 16, 1980.*

Decided March 12, 1981.

As Amended May 14, 1981.

* Assigned October 15, 1980 following submission of additional data by counsel.

Sanford M. Litvack, Asst. Atty. Gen., John J. Powers, III, Andrea Limmer, Dept. of Justice, Washington, D. C., Alexander L. Morton, Director, Interstate Commerce Commission, Richard A. Allen, Gen. Counsel, Henri F. Rush (argued), Associate Gen. Counsel, Ellen K. Schall, Interstate Commerce Commission, Washington, D. C., for respondent, Interstate Commerce Commission, Rail Services Planning Office.

Lewis H. Van Dusen, Jr. (argued), Henry S. Hilles, Jr., P. Alan Bulliner, Drinker, Biddle & Reath, Philadelphia, Pa., for petitioner, Southeastern Pennsylvania Transportation Authority.

Patricia A. Godfrey, Donald A. Brinkworth (argued), Philadelphia, Pa., for intervenor, Consolidated Rail Corporation.

Before GIBBONS, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

SEPTA has filed a petition for review alleging that (1) the RSPO erred in promulgating a Standard requiring a commuter rail subsidizer to pay interest to Conrail on late payments without also promulgating a Standard requested by SEPTA which would mandate payment of penalties by Conrail for substandard service; and (2) the RSPO erred in failing to amend the Standards to provide that the liability of SEPTA for any payment to Conrail be limited to SEPTA's rail commuter assets and revenues.

SEPTA, the acronym for Southeastern Pennsylvania Transportation Authority, is a public authority organized in corporate form pursuant to a Pennsylvania statute, the Metropolitan Transportation Authorities Act of 1963, Pa.Stat.Ann. tit. 66, §§ 2001–2043 (Purdon Supp.1980). The RSPO is the Rail Services Planning Office of the Interstate Commerce Commission, which in addition to its other duties, is required to issue regulations containing "standards for the computation of subsidies for rail passenger service." 4R Act, § 309, currently codified at 49 U.S.C. § 10362 (Supp. III 1979). Intervenor Conrail is the Consolidated Rail Corporation, a Pennsylvania corporation which, inter alia, operates SEPTA's commuter rail services.

The legislative background for the formation of Conrail and the RSPO is set forth in some detail in our opinion filed today in the companion case of Southeastern Pennsylvania Transportation Authority v. ICC, 644 F.2d 238 (3d Cir. Mar. 12, 1981) (SEPTA I), and will not be repeated here except to the extent reference is required for the specific issues raised in this appeal.[1]

As we noted in SEPTA I, the RSPO has the statutory obligation to promulgate Standards for determining commuter rail service continuation subsidies. SEPTA and Conrail are to negotiate an agreement governing the terms and conditions under

---

1. The appeal in this matter was consolidated for briefing and disposition with the appeals in Southeastern Pennsylvania Transportation Authority v. ICC, Nos. 78–2345 and 80–1237 (SEPTA I), on the unopposed motion of petitioner SEPTA. Although the legislative background underlying both appeals is similar, the appeals present distinct and unrelated legal issues. Accordingly, that portion of the order consolidating the appeals for disposition on the merits is vacated. The opinion in SEPTA I is also being filed today. With respect to statutory citations used herein, see SEPTA I, note 2. The RSPO Standards appear in 49 C.F.R. Part 1127 (1979) and are cited in this opinion as "Standards, § X."

which Conrail will provide commuter rail service. Such an agreement may modify the Standards as promulgated, subject only to the review of such modification by the RSPO. Standards, § 1127.3(d)(1).

In the course of negotiating their agreement, Conrail and SEPTA reached an impasse with regard to the payment by SEPTA of interest on late subsidy payments and the assessment of penalties against Conrail for substandard performance. These questions were presented to the RSPO for mediation.[2] The mediator, Alan M. Fitzwater, Director of the RSPO, sent the parties a letter March 9, 1977 reflecting his views. Thereafter, SEPTA sought reopening of the prior rulemaking proceeding to consider amendments to the Standards in order to adopt SEPTA's proposals. The RSPO declined to reopen. This petition for review concerns the RSPO's failure to modify the Standards in two respects requested by SEPTA.

## II.

### Mandatory Interest Payments

SEPTA contends that it should not be required to pay interest on late payments in the absence of imposition on Conrail of penalty provisions which SEPTA feels are necessary to insure a satisfactory level of service. The Standard requiring payment of interest provides, in part, "Interest on overdue subsidy payments shall accrue ... for such period as they remain unpaid and the railroad has not terminated the service." Standards, § 1127.3(e). Under the scheme established by the Standards, a subsidizer is required to make estimated payments monthly, in advance. If the actual amount of the subsidy payment is determined to be less than the estimated amount paid by the subsidizer, Conrail must refund the difference with interest. When SEPTA is late in making its payments, it must pay interest. *Id.*

SEPTA first challenges the RSPO's authority to promulgate a standard requiring a subsidizer to pay interest on late subsidy payment installments on the ground that the provision of this Standard exceeds the RSPO's rulemaking authority. SEPTA contends that the RSPO is only empowered to determine the appropriate amount of the subsidy payments to insure that Conrail is compensated for its avoidable costs and return on value. It views the requirement of interest as the imposition of a penalty, and argues that the statutory provision permitting Conrail to discontinue rail passenger service if an applicable payment is not made when due. 3R Act, § 304, *currently codified at* 45 U.S.C. § 744(e)(2)(C) (1976), constitutes Conrail's exclusive remedy for late payments.

Some background into the evolution of the Standard may be useful to a full understanding of the statutory basis the RSPO uses to support its authority. When the RSPO initially considered Conrail's request that the subsidizers should be assessed a late payment charge equal to 12% simple interest a year, the RSPO refused to provide for such interest. Its reasoning for failing to do so was similar to that maintained by SEPTA in this appeal. The RSPO stated that such interest "would be in the nature of a penalty to discourage late payments, rather than a return on investment; inasmuch as [the statute] provides that the penalty for late payment may be service discontinuance, it does not appear that an additional monetary penalty would be warranted." 41 Fed.Reg. 20104, 20108 (1976). On further consideration, the RSPO promulgated the mandatory interest standard. At that time it explained that "[i]t would be impracticable and undesirable if the operator's [Conrail's] only recourse in the event of delayed payments were to be abrupt service discontinuance or threats thereof." 41 Fed.Reg. 26936, 26939 (1976). Additionally, the RSPO noted the difficulties faced by Conrail's predecessor railroads in collecting their subsidy payments from

2. The Standards provide that "Upon request of either party, RSPO will mediate disagreements concerning the facilities utilization plan, the

manpower utilization plan, the subsidy agreement and the application of these standards." Standards, § 1127.3(d)(4).

states or transportation authorities. 41 Fed.Reg. 32546, 32553 (1976).

If these were the only bases on which to ground the RSPO's statutory authority to promulgate the interest Standard, we might share SEPTA's view that it is insufficient. However, as the RSPO subsequently explained, the requirement that subsidizers pay interest stems from its implementation of the statutory prohibition of cross-subsidization. The RSPO's obligations are defined in Section 205(d) of the 3R Act, as amended, *currently codified at* 49 U.S.C. § 10362(b) (Supp. III 1979), the relevant portion of which provides, that the RSPO shall

(5) maintain regulations that contain

(A) standards for the computation of subsidies for rail passenger service . . . *that are consistent with the compensation principles described in the final system plan . . . and which avoid cross-subsidization among commuter, intercity, and freight rail transportation;* and

\* \* \* \* \* \*

(6) maintain, and from time to time revise and republish . . . standards for determining the revenue attributable to the rail properties, the avoidable costs of providing transportation, [and] a *reasonable return on the value* . . . [as those terms are used in 45 U.S.C. § 744].

(emphasis added).

The RSPO explains that it has implemented the congressional mandate against cross-subsidization by promulgating the interest Standard which is designed to insure that Conrail will not utilize its own working capital to finance SEPTA's commuter service. Rather the funds needed by Conrail to operate the commuter service will be received in advance, since both passenger fares and subsidy payments are paid in advance. Accordingly, in computing the investment base on which SEPTA is required to pay Conrail a reasonable return on value, no working capital component is included. 41 Fed.Reg. 20104, 20108 (1976); 41 Fed. Reg. 26936, 26939 (1976); 41 Fed.Reg. 32546, 32553 (1976). The *quid pro quo*, as it were, for not including a working capital

component as part of this investment base is that the capital needed to operate the commuter service be received in advance by Conrail. When the payments are not received in advance *i. e.*, are not timely made, the justification for excluding a working capital component in the investment base is no longer applicable. Late payments by SEPTA would require Conrail to utilize its own working capital, for which it is not compensated by receipt of a reasonable return on value, and therefore SEPTA must be held accountable for interest in order to fully reimburse Conrail for the costs it incurred in providing commuter services.

Since interest is merely "money paid for the use of other money," D. Dobbs, Remedies, § 3.5 (1973), it does not represent an additional type of compensation over and above the net avoidable costs and reasonable return on value which the statute requires SEPTA to pay Conrail. Thus SEPTA's argument that the RSPO's imposition of interest on late payments exceeds its statutory authority because such interest would be a form of compensation which the Act does not specifically require SEPTA to pay to Conrail is unavailing. Similarly, since the imposition of interest accords with, and is arguably mandated by, congressional policy against cross-subsidization, the RSPO's action is clearly not inconsistent with its statutory authority.

SEPTA also contends that the RSPO was without authority to impose interest payments because the Act contemplates discontinuance of service as Conrail's exclusive remedy in the event that payments by subsidizers are not timely received. By negative implication, therefore, SEPTA reasons that the RSPO has no statutory authority to provide for a different remedy and that its determination that "[i]t would be impracticable and undesirable if the operator's only recourse in the event of delayed payments were to be abrupt service discontinuance or threats thereof," 41 Fed.Reg. 26936, 26939 (1976), constituted a policy decision which only the legislature is empowered to make. We see no indication in the Act that the discontinuance remedy was

intended to be exclusive, and are not persuaded that any attempt by the RSPO to devise other means to encourage continuation of service and timely payment of subsidies must be held to be beyond the RSPO's statutory authority. This is particularly true when it is manifest that the statutory intent was to devise reasonable means to permit the continuation of commuter service. Forcing Conrail to the exclusive remedy of discontinuance of service for late payments, with the attendant dislocation to individuals and business, would contravene that congressional intent. Moreover, Conrail argues that the discontinuance remedy is not adequate since Conrail is required to give 60 days' notice prior to discontinuance and would therefore be subsidizing SEPTA's commuter service by having to fund it for 60 days without the opportunity to be reimbursed with interest. *See* 3R Act, § 304(a)(1)(B), *currently codified at* 45 U.S.C. § 744(a)(1)(B) (1976) (60 day notice provision). Therefore, we affirm the RSPO's authority to promulgate a Standard requiring the subsidizer to pay interest on late subsidy payments.

■ Having determined that the RSPO neither exceeded nor acted inconsistently with its statutory authority, we next look to see if its action was arbitrary or capricious. *See* 5 U.S.C. § 706(2)(A) (1976) (reviewing court must set aside agency action if arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law); *Concord Township, Delaware County, Commonwealth of Pennsylvania v. United States,* 625 F.2d 1068, 1072 (3d Cir. 1980). In light of the foregoing considerations, as well as the strong congressional interest in uninterrupted commuter services, *see* 4R Act, § 804, *currently codified at* 45 U.S.C. § 744(e)(1) (1976) (mandatory continuation of commuter services during interim period following passage of Act) and the RSPO's attempt to be evenhanded by requiring Conrail to return overestimated amounts to SEPTA with interest, we cannot denominate the RSPO's interest provision as arbitrary or capricious.

### III.

### *Failure to Require Penalties for Substandard Service*

■ In June 1977, SEPTA petitioned the RSPO to initiate the procedure necessary to amend the Standards to provide, in part:

The subsidy agreements may include reasonable provisions . . . for the accrual of interest on overdue subsidy payments . . . for such period as they remain unpaid and the railroad has not terminated service.

The subsidy agreements may include reasonable provisions . . . for penalties for service inferior to stipulated performance standards or incentive payments for superior performance, or both.

42 Fed.Reg. 54920, 54921 (1977).

SEPTA contends that the RSPO's refusal to impose substandard performance penalties on Conrail renders its interest provision arbitrary and capricious.[3]

---

**3.** SEPTA also argues that the refusal of the RSPO to impose penalty requirements upon Conrail "violates the statutory provision that SEPTA's share of the commuter subsidy from April 1976 through September 1978 was to be based in part upon 'the same level' of subsidy paid to the Penn Central and Reading trustees prior to the conveyance of rail properties to Conrail. 49 C.F.R. § 1127.8. The amount SEPTA had been paying to the bankrupt railroads was reduced by refunds in the form of penalties suffered by the operators. The RSPO has not permitted SEPTA to impose similar requirements upon Conrail, and has therefore violated the statute by requiring SEPTA to pay greater subsidies for this period of time than it paid the predecessor operators." SEPTA's brief at 16–17.

SEPTA appears to be mixing the statutory requirement that during the 180 day mandatory period (which expired September 27, 1976) the subsidizer was obliged to continue providing the same level of financial assistance it had provided to the predecessor railroads, 4R Act, § 804, *currently codified at* 45 U.S.C. § 744(e)(2) (1976), with the requirement of the Standards, to which it cites (now repealed) that a subsidizer was entitled to reimbursement from the federal government for the additional costs incurred by it during the period from September 28, 1976 to September 27, 1978 to sustain the same level of service previously provided. *See* 49 C.F.R. § 1127.8(c) (1977) *re-*

The RSPO explained its decision to require interest but not service penalties as follows:

> The Office is sympathetic with SEPTA's desire to negotiate penalty provisions to induce a satisfactory level of service. The Office acknowledges, too, its observation during rulemaking that the assessment of interest is "in the nature of a penalty to discourage late payments, rather than a return on investment" (see 41 FR at 20108). Nevertheless, in adopting the interest provision, the final standards provided that interest on overdue payments would accrue only "for such period as the operator agrees to waive any rights to terminate service" (41 FR at 26939). Thus ConRail's forebearance from exercising its statutory right of discontinuance when payments are not made "when due" (Section 304(e)) constitutes the quid pro quo for late payment charge. The imposition of interest on late and overpayments is also consistent with the no cross subsidization principle of Section 205(d). For these reasons, the Office adheres to its conclusion that the present interest provision should be retained.

*Id.* While we are also sympathetic to SEPTA's claim that without a penalty mandated by the RSPO, it has no basis to induce Conrail to agree voluntarily to such a requirement in its negotiated argument, we cannot say that the RSPO abused its discretion in failing to impose such a requirement.

Moreover, SEPTA overlooks the fact that substandard performance, unlike late subsidy payments, does not implicate the policy against cross-subsidization. In fact, there is serious question whether the RSPO would have been authorized to impose such a penalty requirement. There simply is no statutory basis for tying performance penalties with interest payments. Thus the RSPO's decision to impose interest payments while leaving the question of substandard per-

formance penalties open for negotiation between SEPTA and Conrail, *see* Standards, § 1127.7(g), was neither arbitrary nor capricious. [1]

## IV.

### *Insulation of SEPTA's Non-Rail Properties*

Pursuant to the statutory provision requiring Conrail to provide service if "*a financially responsible person* (including a government entity) offers ... to provide a rail service continuation payment," 3R Act § 304(c)(2), *currently codified at* 45 U.S.C. § 744(c)(2)(A) (1976) (emphasis added), the RSPO established the procedures to be followed by prospective subsidizers seeking to have Conrail continue to provide commuter rail services. The Standards promulgated on August 3, 1976 required that the offer of financial assistance must contain "[i]nformation demonstrating that the prospective subsidizer has or will have the financial resources to subsidize the service and otherwise fulfill its contractual obligations." 49 C.F.R. § 1127.3(c)(3) (1976).

In the course of negotiating its operating agreement with Conrail, SEPTA proposed that its liability should be limited to funds it received from government sources for the continuation of rail service. SEPTA raised this issue because its operations are not limited to the rail properties used in the commuter service. Instead, it was created as a multi-faceted corporation with responsibilities for bus, trolley and subway operations as well as commuter rail service. SEPTA has no taxing authority of its own and is totally dependent for funding on governmental units, both federal and local. Conrail refused to accept the limitation proposed by SEPTA. Conrail also insisted that as a condition of its execution of the operating agreement, the local funding authorities must undertake in writing to meet any retroactively determined "cost overrun."

These issues were among those submitted to the mediator, who stated that Conrail

---

*pealed* 44 Fed.Reg. 16402, 16408 (1979). In any event, since both time periods have expired we need not address SEPTA's statutory argument, since it points to no presently applicable provision.

"has no absolute right to insist upon a 'recourse' clause, running against SEPTA's funding governments" and that "SEPTA has no right to insist upon a non-recourse clause limiting its own liabilities as the contracting party with Conrail." Memorandum on Results of Mediation Session, March 9, 1977, *reprinted in* A–94, 96. Since the parties were required to complete their agreement by March 27, 1977,[4] they did so, memorializing in the agreement the issues as to which they could not agree.[5] Letters from the Commonwealth of Pennsylvania, State of Delaware, City of Philadelphia, and the four Pennsylvania counties, Bucks, Chester, Delaware, and Montgomery, embodying an undertaking for each funding authority for "cost overruns" in the same ratio as its original funding commitment, were incorporated into an amendment to the operating agreement dated April 4, 1977.

Thereafter, on June 3, 1977 SEPTA filed a petition with the RSPO seeking to reopen rule-making to amend the Standards with respect to its financial commitments and responsibility. There were three distinct areas as to which SEPTA sought amendments to the Standards and the RSPO explanation for its action in refusing to amend the Standards in the manner sought by SEPTA carefully kept the issues separate.

1. SEPTA contended that Congress could not have intended to penalize it if it defaulted in payment of its subsidy to Conrail because of the failure to receive funds required to be paid by the federal government. The amendment it proposed in this regard was as follows:

> Notwithstanding any other provision of this part, in the event that the Secretary (of Transportation) shall fail to pay any

such monthly amount in advance to the subsidizer, the subsidizer's obligation to make monthly payments to the railroad for continuation of commuter rail service shall be reduced by the amount of, and for the duration of, said non-payment, unless said non-payment is occasioned by a default by the subsidizer under any Federal agreement.

42 Fed.Reg. 54920, 54920 (1977).

The RSPO agreed that it would be "patently unfair to penalize the subsidizer solely because the Federal Government does not fulfill its statutory responsibility" and referred to its recent ruling affirming the obligation of the Urban Mass Transportation Authority (UMTA) to reimburse the subsidizer for the interest payable to Conrail on overdue federal assistance. *Id.* The RSPO noted that Conrail has not elected to discontinue service despite the failure of the federal government to disburse emergency funds for nearly a year. It presumed that Conrail has sufficient working capital to await compensation, with interest, from UMTA, and that if its circumstances materially change, Conrail would afford the subsidizers and UMTA a reasonable opportunity to bring the subsidy payments up to date. Thus with respect to this aspect of SEPTA's proposed amendments, the RSPO concluded:

> [I]t would arguably be a reasonable exercise of administrative discretion to excuse the subsidizer from making monthly payments solely because UMTA had not met its advance payment obligation. On balance, however, the Office believes that the public interest will best be served by preserving the existing rights and responsibilities of the parties.

*Id.*

2. SEPTA asserted that if it defaulted in its payments of the subsidy due to Con-

---

4. 49 C.F.R. § 1127.3(d)(1) (1976).

5. The reference to the issues raised here was as follows:

(c) It is Subsidizer's belief that Conrail should be required to agree to the following proposed Section:

Notwithstanding any other provision of this Agreement, the Subsidizer shall not be obligated to make any payment to Conrail unless the Subsidizer shall have received funds for the continuation of rail service from other sources and shall be legally authorized to pay such funds to Conrail.

§ 12.09(c) of the Operating Agreement dated April 4, 1977 between Conrail and SEPTA (the subsidizer) (submitted to the court pursuant to its request).

rail because of a failure of local funding, Conrail, while clearly entitled to discontinue service, was entitled in addition only to obtain a judgment and levy with respect to the funds and assets for its commuter rail operation. It proposed amending the Standards by adding the following proviso to § 1127.3(e) of the Standards:

> ... *Provided, however,* That the liability of the subsidizer for any payment to (the railroad) shall be limited to the funds which the subsidizer shall have received for the continuation of rail service and which the subsidizer shall be legally authorized to pay to (the railroad).

*Id.* at 54920–21. The RSPO concluded "that it would be inappropriate to insulate by administrative regulation SEPTA's nonrail commuter assets and revenues from levy and judgment in the event of default." *Id.* at 54921. It stated that a regulation which effectively shifts the ultimate liability for commuter service from SEPTA to Conrail would be inconsistent with its statutory obligation to avoid cross-subsidization. It stated further:

> Contrary to SEPTA's contention, the Office did not rule in its summary of the mediation session that ConRail was entitled to judgment and levy on all its revenues and assets. This is a question of state law on which the Office expresses no opinion.

*Id.*

3. SEPTA asserted that Conrail's insistence on the additional specific written commitments from the state and local governments on which SEPTA relies for funds went well beyond the information required by the RSPO regulations. In order to eliminate any uncertainty in this connection, it proposed to amend § 1127.-3(c)(3) of the Standards to require that the subsidy offer contain:

> ... information supporting the prospective subsidizer's *reasonable belief* that it has or will have available financial resources adequate to pay the rail service continuation subsidy, *as reasonably estimated* by the subsidizer.

*Id.* (emphasis in original).

The RSPO reiterated that Conrail "has no right to dictate the form by which SEPTA manifests its financial responsibility." *Id.* However, it was not persuaded that SEPTA's proposed amendment was consistent with the statutory provisions since it viewed SEPTA's proposal as effectively shifting the duty for determining whether a person is "financially responsible" from the RSPO to the subsidizer. It stated:

> *Although the Office has not been called upon to rule on the validity of any subsidy offer,* under the statutory scheme, such a determination would be within its administrative discretion.

*Id.* (emphasis added).

SEPTA's petition for review appears to cover all three requests for amendments, combining them in one issue.[6] On the other hand, SEPTA's brief appears at times to be directed only to the request that the RSPO immunize those of its assets unrelated to commuter rail service. However, its brief also refers to the possibility that federal funds as well as local funds may not be forthcoming. Under the circumstances, we will treat the matter under the broader scope of the issue framed by SEPTA as presented for review.

■ Although none of the parties raised the issue, we note that it is well established that agency orders denying relief constitute final orders as required under 28 U.S.C. § 2342 (1976).[7] A decision as to finality,

---

**6.** SEPTA frames the issue presented for review as follows:

Whether the RSPO erred in refusing to amend the Standards which, as interpreted by the RSPO, require a subsidizer of commuter rail service to provide *both* (a) assurances from the funding sources upon which it proposes to rely *and* (b) an undertaking, backed by all assets of the subsidizer (whether related to com-

muter rail service or not), to make subsidy payments to Conrail whether or not funds are received from the funding sources.

**7.** *See Rochester Telephone Corp. v. United States,* 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939). In *City of Chicago v. United States,* 396 U.S. 162, 90 S.Ct. 309, 24 L.Ed.2d 340 (1969), the Court specifically applied *Rochester Telephone* to orders of the ICC. With regard to

however, is not dispositive of the question whether the agency's action is ripe for review.

The fact that the parties do not question the ripeness of the issue for adjudication is not dispositive. As the Supreme Court has stated, "because issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,' we cannot rely upon concessions of the parties and must determine whether the issues are ripe for decision in the 'Case or Controversy' sense." *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 138, 95 S.Ct. 335, 355, 42 L.Ed.2d 320 (1974). As the Court noted further, "ripeness is peculiarly a question of timing ...." *Id.* at 140, 95 S.Ct. at 356. Its decision as to which issues were ripe and which were premature in the *Regional Rail Reorganization Act Cases* provides a helpful model for the matter before us.

One of the claims made by the Penn Central interests in the *Regional Rail Reorganization Act Cases* was that the Conrail securities and United States Railway Association obligations which the Rail Act provided as compensation for the properties required to be transferred was an inadequate form of compensation and hence constituted an unconstitutional taking. The district court had declined to decide this issue on the ground that it was premature. *Connecticut General Insurance Corp. v. United States Railway Association*, 383 F.Supp. 510, 517–18 (E.D.Pa.1974) (three judge court). The district court held that "the basis of plaintiffs' complaint depends on the 'concurrence of ... contingent events ... too speculative to warrant anticipatory judicial determinations,'" *citing Eccles v. Peoples Bank*, 333 U.S. 426, 432, 68

S.Ct. 641, 644, 92 L.Ed. 1153 (1948). The Supreme .Court, on the other hand, after noting that one of those contingencies was no longer in question following the determination by the Special Court that the Rail Act provided a fair and equitable process, held that determination of many of those issues was both desirable and necessary. The Court decided not to delay its resolution of the issues because the parties would be required to make decisions now or in the short future which may be affected by its determination; other possible options, such as an equity receivership, were not available pending implementation of the reorganization; and there was no better time to decide the constitutionality of the Act's mandatory conveyance scheme. 419 U.S. at 144–145, 95 S.Ct. at 359.

In sharp contrast to its decision that adjudication of those issues was ripe was the Court's decision that the controversy over the proper valuation theory to be applied to both the rail properties and the stock of Conrail "depends upon contingencies that argue forcefully for postponement of its resolution." *Id.* at 146, 95 S.Ct. at 360. The Court noted that until the Final System Plan is effective, it would be impossible to ascertain which rail properties will be transferred to Conrail or their value on any valuation theory, or the value of the consideration to be exchanged for the rail properties. Also, the record contained no actual figures supporting various valuation theories, making it impossible for the Court to discern, *inter alia*, the effect of its decision on the adversaries. Finally, the Court noted that there would be ample opportunity in the future to litigate the valuation controversy.

finality, the determination turns on "whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the action taken." *Port of Boston Marine Terminal v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970). Thus, the fact that the RSPO refused to enact SEPTA's proposed amendments does not place the decision outside the realm of appealable orders. *See generally FTC v. Stan-*

*dard Oil Company of California*, —— U.S. ——, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) (agency issuance of complaint based on "reason to believe" statute being violated held not final agency action because not a definitive statement of position); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 199, 76 S.Ct. 763, 768, 100 L.Ed. 1081 (1956) (FCC regulation announcing policy not to issue licenses to specified class of applicants held final because it "operate[d]" to control the business affairs of [petitioner]").

Turning then to the issues subsumed in SEPTA's petition for review on this point, we note that SEPTA was asking the RSPO to determine what would happen *in the event* SEPTA failed to receive funds from its various financial sources, *i. e.* the federal government and the local funding agencies, and *in the event* SEPTA thereafter was unable to pay a timely subsidy to Conrail. We cannot say that the RSPO abused its discretion in declining to amend its Standards to provide for such eventualities. Indeed, there may be substantial question as to the RSPO's power under the statute to insulate SEPTA's non-rail properties. We believe it unwise for this court to reach at this time the issue as to whether the statutory provision authorizing Conrail to discontinue service upon nonpayment, 4R Act, § 804, *currently codified at* 45 U.S.C. § 744(e)(2) (1976), is its sole remedy or whether Conrail is in the same position as any other creditor, and can use the same remedies. We do not know, and cannot assume, that any of the governmental funding agencies will default on their statutory or contractual obligations to SEPTA. Even were that to occur we do not know whether and to what extent SEPTA would be unable to make its required subsidy payment. Thus, SEPTA's request for insulation of its non-rail properties is based on a fact situation clearly conjectural at this time. In addition, we have no figures which show what the value of its rail properties are and whether they would suffice to meet any deficit in its subsidy. It may be that these issues will never arise. It may be that if they arise, there will have been substantial changes in the positions of the parties and the valuation of SEPTA's properties. Thus, SEPTA's request that we decide these issues now would require us to speculate as to events in the future which may never materialize.

SEPTA points to no immediate injury from the RSPO's failure to promulgate the proposed amendments, *compare Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 81–82, 98 S.Ct. 2620, 2634–2635, 57 L.Ed.2d 595 (1978), nor has it shown how the agency decision not to amend the Standards in the manner requested has an impact "sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Compare Abbott Laboratories v. Gardner*, 387 U.S. 136, 152–54, 87 S.Ct. 1507, 1517–1518, 18 L.Ed.2d 681 (1967) (challenged regulations required petitioners to destroy their existing supply of labels, advertisements and promotional materials and undertake to prepare new materials or exposed them to serious criminal and civil penalties for non-compliance). In *Exxon Corp. v. FTC*, 588 F.2d 895, 901 (3d Cir. 1978), this court construed *Abbott* as requiring analysis of both the fitness of the issues for judicial decision and the hardship to the parties of refusing consideration. In that case, we held that the FTC subpoena for documents numbering in the tens of millions, as to which the plaintiffs claimed there would be inadequate protection, created an "extraordinary" situation in which "the magnitude of the possible injury outweighs the lack of immediacy . . . ." *Id.* at 902. SEPTA has undertaken to make no comparable factual claim in this proceeding.

In one respect, the RSPO determinations appear to go beyond the scope of SEPTA's requested amendment and beyond its own discretionary determination not to amend the Standards. The RSPO stated that whether Conrail was entitled to judgment and levy on all of SEPTA's revenues and assets "*is a question of state law* on which the Office expresses no opinion." 42 Fed. Reg. 54921 (1977) (emphasis added). That statement is clearly dictum. If the events, now speculative, do in fact materialize, the parties will presumably meet in an appropriate judicial forum. At that time, the court will be required to decide which law governs the rights and obligations of the parties. The RSPO's statement that state law governs obviously has no binding effect. Furthermore, the RSPO's assumption of the authority to decide a question of conflicts of law is beyond any of its express or implied statutory powers. We believe it is unnecessary for us to remand so that that statement can be excised, since this opinion

should be sufficient to indicate that resolution of this matter, as to which we express no opinion, remains open.

Finally, although SEPTA's issue presented for review makes reference to the assurances from the funding sources which it was required to provide, we do not have before us, nor did the RSPO, any precise claim by SEPTA with regard to such assurances. Had SEPTA been unable to or refused to provide such assurances, or had Conrail refused to provide service based on its unilateral determination of what or who constituted the requisite "financially responsible person," the RSPO would have had a precise issue on which to rule. As the RSPO noted, it had not been called upon to rule on the validity of any subsidy offer. Therefore, again we cannot hold that its failure to amend the Standards in the manner proposed by SEPTA constituted an abuse of its discretion.

For the foregoing reasons, we will deny SEPTA's petition for review.