## PORT OF BOSTON MARINE TERMINAL ASSN. ET AL. *v.* REDERIAKTIEBOLAGET TRANSATLANTIC

No. 99.   Argued October 22, 1970—Decided December 8, 1970

MARSHALL, J., delivered the opinion for a unanimous Court.

*John M. Reed* argued the cause and filed briefs for petitioners.

*George F. Galland* argued the cause and filed a brief for respondent.

*Daniel M. Friedman* argued the cause for the United States et al. as *amici curiae.* On the brief were *Solicitor General Griswold, Assistant Attorney General McLaren, Deputy Solicitor General Springer, Irwin A. Seibel,* and *Gordon M. Shaw.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The underlying dispute here is whether vessel owners or consignees will pay charges[1] for cargo left on the wharves at the Port of Boston. But the central ques-

---

[1] The charge involved is "wharf demurrage," the charge assessed when cargo remains on the pier or wharf after five days, the free time at the Port of Boston. See n. 5, *infra.*

tion we face is whether a resolution of this dispute by the Federal Maritime Commission is binding on respondent. We believe that the Court of Appeals was in error in holding that the Commission's determination was not binding. Accordingly, we reverse.

The Port of Boston Marine Terminal Association is a conference of maritime terminal operators acting pursuant to an agreement [2] approved in 1962 by the Federal Maritime Commission.[3] Prior to 1964, the Terminal Association administered a tariff,[4] on file with the Commission, which assessed charges against a consignee whenever cargo remained on a pier or wharf for more than five days.[5] In that year, the Terminal Association, without prior approval of the Commission, shifted the incidence of the tariff so that a daily fee of one-half cent per 100 pounds was charged a carrier-vessel whenever the failure to remove cargo resulted from a strike by longshoremen.

In 1965 there was a longshoremen's strike that caused cargo to be left on the wharves beyond the five-day—free time—limit. Several vessels refused to pay the revised charges; and the Terminal Association brought a state court action for damages and declaratory relief

[2] Agreement No. 8785. The agreement set out the basic scheme for the protected price fixing engaged in by the terminal operators.

[3] See § 15 of the Shipping Act, 1916, 39 Stat. 733, as amended, 46 U. S. C. § 814.

[4] The basic wharf demurrage charge was assessed against the consignee at a daily rate of $2\frac{1}{2}$ cents per 100 pounds. Under the pre-1964 tariff, if factors beyond the control of the consignee or shipper prevented cargo removal, wharf demurrage would be assessed against the consignee at a daily rate of 1 cent per 100 pounds.

[5] When cargo is brought to the wharf it is considered reasonable, for there to be a delay of up to five days before the cargo is loaded on the vessel or taken away by the consignee.

against the Boston Shipping Association,[6] an organization representing vessel owners and their agents. Following removal to the United States District Court, the Shipping Association defended on the grounds that the revised tariff was not within the scope of the 1962 Terminal Association agreement and could not become effective without Commission approval.[7]

The District Court stayed the proceedings to allow the Shipping Association to obtain a ruling by the Commission on the validity of the change. On June 23, 1967, after a full evidentiary hearing, the Commission issued a report and order concluding that prior approval was not necessary because shifting the incidence of the charge did not "constitute a new agreement or a modification to the existing agreement calling for a new . . . rate-fixing scheme not contemplated in the original agreement."[8] The Commission also approved the change in the fee structure insofar as the change affected cargo that was in free time when the strike started but held that it was unreasonable within the meaning of § 17 of the Shipping Act, 46 U. S. C. § 816,[9]

---

[6] The members of the Shipping Association, including Furness, Withy & Co., Ltd., Transatlantic's agent at the Port of Boston, were also named as defendants.

[7] See *Volkswagenwerk Aktiengesellschaft* v. *FMC*, 390 U. S. 261 (1968).

[8] *Boston Shipping Assn.* v. *Port of Boston Marine Terminal Assn.*, 10 F. M. C. 409, 414 (1967).

[9] "No common carrier by water in foreign commerce shall demand, charge, or collect any rate, fare, or charge which is unjustly discriminatory between shippers or ports, or unjustly prejudicial to exporters of the United States as compared with their foreign competitors. Whenever the Federal Maritime Board finds that any such rate, fare, or charge is demanded, charged, or collected it may alter the same to the extent necessary to correct such unjust discrimination or prejudice and make an order that the carrier shall

to assess charges against the vessel when the cargo was not in free time [10] at the start of the strike.

On September 19, 1967, the Shipping Association petitioned the Court of Appeals for the District of Columbia Circuit for review. But since the petition was filed after the expiration of the 60-day period specified in the Administrative Orders Review Act, 28 U. S. C. § 2344 (1964 ed., Supp. V); the petition was dismissed as untimely. On September 4, 1968, Rederiaktiebolaget Transatlantic, respondent here and one of the carrier-vessels that had been assessed charges, filed an application with the Commission for reconsideration. Transatlantic claimed that it had been represented by an agent [11] in the proceeding brought by the Shipping Association and thus had standing to request a rehearing.

---

discontinue demanding, charging, or collecting any such unjustly discriminatory or prejudicial rate, fare, or charge.

"Every such carrier and every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the Board finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice." 46 U. S. C. § 816.

[10] The Commission also held that the shift in the incidence of the charge did not conflict with the rights and duties of a carrier under the regular legally binding tariff. It found a pre-existing duty on the carrier not only to deposit the cargo on the pier but also to arrange for the consignee to have access to the cargo and sufficient time, i. e., free time, to remove it.

[11] Transatlantic's petition for reconsideration stated that "[i]t is represented in Boston by its Agent, Furness, Withy & Co." and that "Furness, Withy is a member of . . . Shipping . . . which, with its member lines, filed the complaint in this proceeding [before the Commission]." The petition further stated that the Terminal Association claimed the sums "from Furness, Withy as agent of petitioner under the disputed tariff provisions."

Transatlantic urged that the Commission's decision was inconsistent with this Court's intervening decision in *Volkswagenwerk Aktiengesellschaft* v. *FMC*, 390 U. S. 261 (1968), in that the Commission had held the tariff change could be effective without prior approval. The Commission did not, however, pass on the claim but returned the petition as untimely under its Rules of Practice and Procedure.[12]

Transatlantic did not seek direct judicial review of the Commission's denial of the application for rehearing. Instead, it moved to intervene[13] in the action still pending in the District Court. Transatlantic argued that its agent had provided inadequate representation and that it would be liable for a substantial portion of any judgment rendered against the agent. Intervention was granted. The District Court refused, however, to review the merits of the Commission's decision and rendered judgment against the Shipping Association and Transatlantic.[14]

Transatlantic, the only defendant to appeal, was more successful in the Court of Appeals for the First Circuit. That court concluded that Transatlantic was not a party to the Commission proceeding and, therefore, was free to seek independent collateral review of the merits of the Commission's order in the District Court. The Court of Appeals also accepted Transatlantic's position on the

---

[12] Petitions for reconsideration are required to be filed within "30 days after issuance of a final decision or order by the Commission . . . ." 46 CFR § 502.261.

[13] See Fed. Rule Civ. Proc. 24 (a).

[14] The judgment entered by the District Court did not specify Transatlantic as one of the parties-defendant directly liable to the terminal operators. It did, however, provide that Transatlantic's agent, Furness, Withy & Co., was liable for $10,708.87. It is claimed that Transatlantic will be liable for $8,154.85 of this amount.

merits and reversed,[15] concluding that the Commission's ruling was indeed inconsistent with *Volkswagenwerk*.

## I

Transatlantic argues that the District Court erred at the outset in referring the case to the Commission. But this Court recognized early in the development of administrative agencies that coordination between traditional judicial machinery and these agencies was necessary if consistent and coherent policy were to emerge. See *Texas & P. R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426 (1907). The doctrine of primary jurisdiction has become one of the key judicial switches through which this current has passed.[16] When there is a basis for judicial action, independent of agency proceedings, courts may route the threshold decision as to certain issues to the agency charged with primary responsibility for governmental supervision or control of the particular industry or activity involved. *Whitney National Bank* v. *Bank of New Orleans*, 379 U. S. 411, 425 (1965). *Far East Conference* v. *United States*, 342 U. S. 570, 574–575 (1952).

This is an almost classic case for engaging the doctrine. Plainly, the Federal Maritime Commission is primarily responsible for supervising these conferences of marine terminal operators. Just five years earlier, the Commission approved the very agreement that established the basic pattern of this conference's operation, and the scope of this same agreement was the subject of the

---

[15] *Port of Boston Marine Terminal Assn.* v. *Boston Shipping Assn., Inc.*, 420 F. 2d 419 (CA1 1970).

[16] *Civil Aeronautics Board* v. *Modern Air Transport*, 179 F. 2d 622, 625 (CA2 1950); 3 K. Davis, Administrative Law §§ 19.01–19.07 (1958); Jaffe, Primary Jurisdiction Reconsidered. The Anti-Trust Laws, 102 U. Pa. L. Rev. 577 (1954).

present dispute. The Commission was uniquely qualified to consider the dispute in light of the overall policies concerning terminal conferences and the conferences' relationship with both carrier-vessels and consignees. The District Court did not err in determining, for purposes of this litigation, that an Article III court, acting on a single, isolated case-and-controversy record in a private suit in which neither the Commission nor the Government was a party, would lack the requisite capacity. *Tampa Phosphate R. Co.* v. *Seaboard Coast Line R. Co.*, 418 F. 2d 387, 402–404 (concurring opinion) (CA5 1969).

## II

The District Court also concluded correctly that it was without authority to review the merits of the Commission's decision. The Administrative Orders Review Act is explicit: "The court of appeals has exclusive jurisdiction to . . . determine the validity of . . . such final orders of the Federal Maritime Commission . . . ." 28 U. S. C. § 2342 (1964 ed., Supp. V). *Consolo* v. *FMC*, 383 U. S. 607, 613 (1966); *Far East Conference* v. *United States,* 342 U. S. 570, 577 (1952).

It is true that § 31 of the Shipping Act, 46 U. S. C. § 830, states that "except as herein otherwise provided" the procedures governing suits to "enforce, suspend, or set aside, in whole or in part, any order of the [Federal Maritime Commission]" [17] shall be the same as in similar suits in respect of orders of the Interstate Commerce Commission. It is also true that in 1964 Congress provided that when courts refer questions to the Interstate Commerce Commission the referring court shall have

---

[17] The agency entrusted with the duty of administering the Shipping Act has undergone many reorganizations and concomitant name changes since its creation in 1916.

exclusive jurisdiction to review orders arising from the referral. 28 U. S. C. § 1336 (b).[18]

This Court in *Consolo* pointed out,[19] however, that the requirement of § 31 was subject to special provisions applicable to maritime cases "such as the provision in § 2 of the Administrative Orders Review Act that direct review proceedings shall be conducted in the courts of appeals rather than the district courts." 383 U. S., at 613. See *D. L. Piazza Co.* v. *West Coast Line, Inc.,* 210 F. 2d 947 (CA2), cert. denied, 348 U. S. 839 (1954). Moreover, in the legislative history of the special statute providing for review of cases referred to the Commerce Commission, there is not even a hint that Congress thought of the Maritime Commission while considering the problem. And to make the procedure adopted there applicable to maritime cases would vitiate the scheme of the Administrative Orders Review Act—a scheme designed to ensure that the Attorney General has an opportunity to represent the interest of the Government whenever an order of one of the specified agencies is reviewed. 28 U. S. C. § 2348 (1964 ed., Supp. V).

Transatlantic argues that even if the Administrative Orders Review Act provides the exclusive method for reviewing final orders of the Maritime Commission, the Commission's order here was not a final order. But its argument that the order lacked finality because it had

---

[18] "When a district court or the Court of Claims refers a question or issue to the Interstate Commerce Commission for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the Interstate Commerce Commission arising out of such referral." 28 U. S. C. § 1336 (b).

[19] *Volkswagenwerk,* the basis for Transatlantic's claim that the Commission erred, was referred to the Commission by a district court and the Commission's order was attacked directly in the Court of Appeals. 390 U. S., at 266–267.

no independent effect on anyone and resembled an interlocutory court order denying a motion to dismiss a complaint has the hollow ring of another era.[20] Agency orders that have no independent coercive effect are common. See *Frozen Food Express* v. *United States,* 351 U. S. 40, 44 (1956). Moreover, the relevant considerations in determining finality are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action. *ICC* v. *Atlantic Coast Line R. Co.,* 383 U. S. 576, 602 (1966); *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 143 (1939).

Here there was no possible disruption of the administrative process; there was nothing else for the Commission to do. And certainly the Commission's action was expected to and did have legal consequences.

The final proffered argument to justify a collateral attack on the Commission's order is that Transatlantic was not a party to the proceeding before the Commission and not bound by the Commission's action. Although Transatlantic was not named as a party, it was in fact represented before the Commission and has previously made numerous claims to party status.[21] In the petition for reconsideration filed with the Commission, it asserted that it had been represented in the administrative evidentiary proceeding through its agent. The claim was also made in support of the motion to intervene in the resumed district court proceeding. There Transatlantic alleged that "at all times" prior to the filing of the petition for reconsideration with the Commission it "had

---

[20] See, *e. g., Muskrat* v. *United States,* 219 U. S. 346 (1911). See generally 3 K. Davis, *supra,* §§ 21.01–21.10.

[21] See n. 11, *supra.*

been represented by counsel for" its agent and claimed that this representation was inadequate.

Even if Transatlantic was not a formal party its interests were clearly at stake. And it had every opportunity to participate before the Commission and then to seek timely review in the Court of Appeals. It chose not to do so. Certainly, from this posture, it cannot force collateral redetermination of the same issue in a different and inappropriate forum. *United States* v. *Western P. R. Co.*, 352 U. S. 59, 69 (1956).

### III

Since the time for Court of Appeals review had run, the decision of the Federal Maritime Commission had become final when the case returned to the District Court. After that return neither the District Court nor any Court of Appeals nor this Court had or has authority to review the merits of that decision.

*Reversed.*