James L. BARKER, Jr., and John J. Flynn, Petitioners,

v.

UTAH PUBLIC SERVICE COMMISSION and U.S. West Communications, Inc., Respondents.

Division of Public Utilities and Committee of Consumer Services, Intervenors.

No. 960080.

Supreme Court of Utah.

March 3, 1998.

Rehearing Denied April 23, 1998.

Robert A. Peterson, Salt Lake City, for petitioners.

Jan Graham, Attorney General, Annina M. Mitchell, Assistant Attorney General, Salt Lake City, for Public Service Commission.

Gregory B. Monson, John M. Eriksson, Salt Lake City, and Molly Hastings, Douglas N. Owens, Seattle, WA, for U.S. West.

Michael L. Ginsberg, Phillip C. Pugsley, Kent Walgren, Assistant Attorneys General, Salt Lake City, for intervenors.

DURHAM, Justice:

We hear this case on petition for review of a final agency action by the Public Service Commission (the Commission) determining the amount of reasonable attorney fees to be awarded to petitioners John J. Flynn and James L. Barker, Jr. *See* Utah Code Ann. § 63–46b–16(1). We modify the Commission's decision as described below.

## I. FACTS AND PROCEDURAL HISTORY

In 1994, we held that the Commission could not increase U.S. West Communications, Inc.'s (USWC) authorized rate of return on equity above a reasonable rate of return, that the statute permitting a public utility to veto a Commission decision constituted an unconstitutional delegation of power, and that the incentive rate regulation plan presented by the Commission was "arbitrary, capricious, and unlawful." *Stewart v. Utah Pub. Serv. Comm'n,* 885 P.2d 759, 773, 779, 781 (Utah 1994). The petitioning ratepayers were represented by attorneys Flynn and Barker. Given the important public interests vindicated by petitioners, we awarded them attorney fees, although not statutorily authorized, under two alternative theories—private attorney general or common fund. *Id.* at 783. This case was the first in which we awarded attorney fees not authorized by a contract or statute. *Id.* We remanded two issues to the Commission for decision: (1) the lawful rate of return on equity permitted to USWC and (2) the amount of reasonable attorney fees. *Id.* at 773, 783.

In September 1995, the parties executed and filed a stipulation with the Commission requiring USWC to refund its ratepayers $3,212,852 plus interest, settling all issues on remand except attorney fees. In December, the Commission issued an order on refund which differed from the initial stipulation. In mid-January 1996, petitioners requested a rehearing on the refund order. The Commission granted this request and heard petitioners on January 31, 1996. On February 22, 1996, the Commission issued its "Order on Reconsideration of Order on Refund," dealing with the rate of return issues.

Prior to its final resolution of the refund issues, on December 20, 1995, the Commission issued an order of attorney fees, reducing the reported hours spent on the case by twenty-five percent, compensating Flynn at $250 an hour and Barker at $175 an hour, rejecting application of a multiplier or an award of a percentage of the common fund, allowing payment of copying, postage, and other expenses, reducing paralegal compensation from the requested $50 to $25 per hour, denying compensation for secretarial work, and refusing to award any attorney fees related to the adjudication of the attorney fees themselves. The order further stated that attorney fees not in dispute that are "authorized by this order" should be paid "forthwith." Because the Commission found that USWC had to disgorge overcharges to its ratepayers, thus creating a common fund, the attorney fees awarded will come out of that fund. *See Stewart,* 885 P.2d at 783.

In early January, believing that the Commission had unreasonably reduced their compensation, petitioners requested a rehearing on the attorney fees order. The Commission constructively rejected this request by failing to respond within twenty days. *See* Utah Code Ann. § 63–46b–13(3)(b). Petitioners subsequently petitioned this court for a writ of review on the attorney fees order, and we granted the writ.

## II. JURISDICTION

█ This court has jurisdiction to review "final agency action resulting from formal adjudicative proceedings." Utah Code Ann. § 63–46b–16(1). The Commission argues that this court lacks jurisdiction to review the attorney fees order because it does not represent a *final* agency action. We conclude that the record established that the order was final and that all parties viewed it as such until review.

The Commission divided the questions presented by this court's remand in *Stewart,* 885 P.2d 759, into two parts: one addressing attorney fees, the other addressing the appropriate rate of return and customer reimbursement. The Commission issued the attorney fees order first and the refund order second. The refund order does not change any aspect of the attorney fees order.

The Utah Administrative Procedures Act does not specifically define "final agency action." However, it does say that an agency will contemplate reconsideration of an order only "if the order would otherwise constitute final agency action." Utah Code Ann. § 63–46b–13. We can thus assume the Commission considered the attorney fees order to be a final agency action by virtue of its failure to

indicate that the action was not final at the time of the rehearing request. The Commission merely denied the request for rehearing by nonaction instead of notifying petitioners that they would have to apply for rehearing at a later date.

Moreover, the reconsideration of the refund order undertaken thereafter does not address the attorney fees order except to acknowledge it as final and appealable. The refund order specifically discusses what will happen if either party appeals the attorney fees order.[1] It never suggests that it supersedes or somehow subsumes the attorney fees order; it purports to modify only the earlier order and stipulation regarding the refund. Thus quite clearly, at the time of appeal, all parties understood the order on attorney fees to constitute an appealable final agency action. We see no reason to regard it differently.

■ Because of the nature of agency proceedings, final actions often take place seriatim, disposing completely of discrete issues in one order while leaving other issues for later orders. Such orders will be final as to any issue fully decided by that order and appealable any time from the date of that order to the last day to appeal the last final agency action in the case.

■ For assistance in defining "final agency action" more explicitly, we look to other state and federal laws which employ the term. The U.S. Supreme Court has held, with regard to the Administrative Orders Review Act, 28 U.S.C. § 2342 (1988):

> [T]he relevant considerations in determining finality are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action.

*Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797, 112 S.Ct. 2767, 2773–74, 120 L.Ed.2d 636 (1992) (interpreting Administrative Procedure Act, 5 U.S.C. § 704 (1988)). Similarly, the Model State Administrative Procedure Act defines final agency action negatively as "the whole or a part" of any action which is not "preliminary, preparatory, procedural, or intermediate with regard to subsequent agency action of that agency or another agency." 1981 Model State Admin. P. Act § 5–102(b)(2).

The attorney fees order in this case meets both of these definitions. When the Commission failed to grant a rehearing on the order, it reached the end of its decision-making process on this issue. Hence judicial review at this point will not interfere with the Commission's proceedings. Moreover, the language of the order makes clear that the Commission determined obligations of the parties with which the parties must immediately comply. In addition, this order clearly falls under the Model Act's definition of "final" because it is not even arguably preliminary, preparatory, procedural, or intermediate.

This ruling is consistent with prior Utah cases. The Utah cases on finality found no final order in the following circumstances: (1) a remand for further proceedings, *Sloan v. Board of Review*, 781 P.2d 463, 464 (Utah Ct.App.1989); (2) an order converting informal proceedings into formal ones, *Merit Elec. & Instrumentation v. Department of Commerce*, 902 P.2d 151, 153 (Utah Ct.App. 1995); and (3) a denial of a motion to dismiss, *Barney v. Division of Occupational & Professional Licensing*, 828 P.2d 542, 544 (Utah Ct.App.1992). These cases do not involve actions in the nature of a seriatim final order; they all involve preliminary, preparatory, procedural, or intermediate decisions. Thus our holding today merely clarifies the definition of "final agency action" rather than changing it.

We emphasize, however, that this rule applies only to *administrative* determinations. It does not in any way affect the rules of

---

**1.** The order specifically states, "[I]f any party appealed the Commission's Order on attorney fees ..., U.S. West Communications, Inc .... would not need to make the refund or pay the attorney fees until the amount of attorney fees was finally determined."

appealability governing cases from the district court and the court of appeals.

## III. STANDARD OF REVIEW

█ Ordinarily, we review attorney fee awards under an abuse of discretion standard. *Salmon v. Davis County*, 916 P.2d 890, 897 (Utah 1996) (Russon, J., dissenting) (stating standard of review in which three justices concur). However, in a case such as this, where the trier of fact is one of the parties whose actions we adjudicated prior to remand, we believe that fairness requires review of the Commission's findings on attorney fees under an intermediate standard, affording the Commission some discretion, as in mixed fact and law determination. *See State v. Pena*, 869 P.2d 932, 938 (Utah 1994) (stating that "policy reasons" can require court to limit discretion afforded lower court).

The dual role of advocate and adjudicator occasionally creates potential for at least the appearance of conflicts of interest for administrative agencies. *See V-1 Oil v. Department of Envtl. Quality*, 939 P.2d 1192, 1196–98 (Utah 1997). This risk seems particularly realistic where an agency is required to determine compensation due to attorneys' representing parties who have defeated the agency's position in an adversarial proceeding.

Under these circumstances, due process requires a somewhat heightened standard of review. *See* Utah Const. art. I, § 7. In *Anderson v. Industrial Commission*, 696 P.2d 1219, 1221 (Utah 1985), for example, we noted, "Fairness requires not only an absence of actual bias, but endeavors to prevent even the possibility of unfairness." We reiterated this sentiment in *Bunnell v. Industrial Commission*, 740 P.2d 1331, 1333–34 (Utah 1987), where we held that an administrative law judge's behavior suggested partiality warranting a remand.

In *Stewart*, this court pointedly criticized the Commission's actions and ruled in the petitioners' favor. Despite our complete confidence in the professionalism of the Commission, a potential for the appearance of bias exists in this situation. This is particularly true where the Commission must make subjective determinations about the attorneys' skills, the quality of the results obtained, and the difficulty of the questions involved, as required in attorney fee determinations. The federal government and some states have handled this problem by giving the court that overturns an agency's ruling permission to determine attorney fees. *E.g.*, 5 U.S.C.S. § 504(c)(1) (Law.Co-op.1989) & 28 U.S.C.S. § 2412(d)(3) (Law.Co-op.1990); 5 Ill. Comp. Stat. Ann. 100/10–55(c) (West 1993).

In Utah, because final agency actions are reviewed directly by appellate courts, determining attorney fees without a prior record on the issue would place an unrealistic burden on the appellate system; appellate courts are not designed to hear fact questions. Therefore, asking the Commission to hear evidence and make findings of fact on the amount of attorney fees makes sense. However, to prevent the possibility of unfairness, we will undertake a moderate degree of scrutiny of the agency's determinations on the appropriateness of the award amount.

Moreover, as petitioners point out, the relief they acquired was fashioned by this court in *Stewart*; thus, we have an advantage in assessing its value. We generally give deference on attorney fee determinations to the " 'judge who actually presided over the proceeding and has first-hand familiarity with the litigation,' " *Salmon*, 916 P.2d at 892–93 (quoting *Utah Dep't of Social Servs. v. Adams*, 806 P.2d 1193, 1197 (Utah Ct.App. 1991)), and in these circumstances, giving weight to this court's similar familiarity is appropriate. Reviewing the Commission's determination under an intermediate standard in this case, however, follows prior policy in addition to preserving both the appearance of fairness and fairness itself.

## IV. ATTORNEY FEES AWARD

█ Courts award attorney fees for various reasons in various ways. *See generally Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237. As stated above, because the result in *Stewart* created a common fund, the attorneys in this matter will receive their compensation

from that fund. *Stewart*, 885 P.2d at 783. Courts award attorney fees in common fund cases "to avoid the unjust enrichment of those who benefit from the fund that is created ... by the litigation and who otherwise would bear none of the litigation costs." *Court Awarded Attorney Fees*, 108 F.R.D. at 250. In this case, Barker and Flynn, at the request of a few ratepayers, undertook enormous investments of time and money which, after six years, accrued to the benefit of all U.S. West ratepayers in Utah. Thus, the traditional common fund theory applies; the ratepayer beneficiaries should not receive the benefit of the attorneys' work without compensating them.

With this rationale in mind, we consider what constitutes reasonable attorney fees. In *Stewart*, we directed the Commission to award fees in accordance with our decision in *Cabrera v. Cottrell*, 694 P.2d 622, 624–25 (Utah 1985). *Stewart*, 885 P.2d at 783. *Cabrera* was a fee shifting case, where the opposition, as opposed to the beneficiaries of the fund, paid the attorney fees. In that case, we instructed trial judges making attorney fee determinations to consult the Utah Code of Professional Responsibility DR 2–106.[2] *Cabrera*, 694 P.2d at 624. In deciding if a fee is generally reasonable, a court should consider the following:

(1) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly;

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) The fee customarily charged in the locality for similar legal services;

(4) The amount involved and results obtained;

(5) The time limitations imposed by the client or by the circumstances;

(6) The nature and length of the professional relationship with the client;

(7) The experience, reputation and ability of the lawyer or lawyers performing the services; and

(8) Whether the fee is fixed or contingent.

*Stewart* is the first Utah case to permit attorney fees not explicitly authorized by statute or contract. *Stewart*, 885 P.2d at 782. This case represents the first time we have supervised an award under the common fund theory. *See id.* at 782–83. Therefore, we must account for ways in which such awards might require adjustments to the principles affecting ordinary attorney fee cases.

■■■ As courts often do, we will use the lodestar method in considering the attorney fees in this case. *See Court Awarded Attorney Fees*, 108 F.R.D. at 242–43. An alternative approach—the percentage of the fund method, described in *id.* at 255—is available, but we apply the lodestar method because the Commission chose to use that method. The lodestar method requires a determination of the hours reasonably expended on the case as well as a reasonable hourly rate for the services. *Id.* at 243. These two amounts are multiplied, and the total is increased or decreased to account for the level of the risk involved in the case and the quality of the work. *Id.; see also Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir.1976) (clarifying lodestar method set forth in earlier opinion of same case, 487 F.2d 161 (3d Cir. 1973)). Courts often refer to this adjustment of the basic hourly award as a "multiplier." *Court Awarded Attorney Fees*, 108 F.R.D. at 243. We specifically addressed the factors implicated by the use of a multiplier in *Plumb v. State*, 809 P.2d 734, 740 n. 7 (Utah 1990). There, citing *Lindy*, we delineated five factors to consider explicitly in fixing a multiplier: (1) the quality of work performed, (2) the contingent nature of the case,[3] (3) the

---

**2.** Utah Rules of Professional Conduct 1.5(a) Code of Professional Responsibility has since been designated Rules of Professional Conduct, but rule has not changed.

**3.** We are aware of the U.S. Supreme Court's rejection of an increase for contingency cases in fee shifting determinations. *See Burlington v. Dague*, 505 U.S. 557, 567, 112 S.Ct. 2638, 2644, 120 L.Ed.2d 449 (1992). We do not believe that the Court's reasoning has equal force in common fund cases.

plaintiff's burden, (4) the risks assumed, and (5) the delay in payment. *Id.*

The Commission agreed to compensate Flynn's time at $250 an hour and Barker's at $175 an hour, and petitioners do not object to these rates. They do, however, take issue with a number of the Commission's other findings, which we address below.

### A. Twenty–Five Percent Reduction of Hours Reported

■ The Commission reduced the number of hours spent by Barker and Flynn on the *Stewart* case by twenty-five percent. Petitioners argue that the reduction violated due process principles because no one presented the Commission's reasons for reduction at the hearing on fees, depriving petitioners of an opportunity to respond. The Commission contends that it made the twenty-five percent reduction because the attorneys' time records lacked meaningful detail; Barker reconstructed his time spent on the case; two attorneys spent time on the same task; the records reflected inconsistencies in time billed for the same task; and the time billed for certain tasks appeared excessive on its face.

The Commission did not violate petitioners' due process rights in making its findings. In *Plumb*, 809 P.2d at 743, we held that a magistrate violated a class counsel's due process rights by making an attorney fee determination without counsel's having notice and by failing to hold a hearing on the issue. Here, petitioners had adequate notice of the hearing and presented testimony and evidence in support of their case. Furthermore, the hearing transcript reflects the Commission's concerns, for example, when one Commissioner remarked, "[T]he Division and the Committee have attacked [Flynn's hours] on various grounds[,] one of which was they are not sufficiently detailed." Therefore, petitioners had an opportunity at the hearing to respond to the Commission's concerns, and the Commission did not violate their right to due process.

■ Thus the Commission's twenty-five percent reduction multiplier was not proce-durally deficient. We examine the evidence, however, to determine whether the reduction was justified on substantial grounds. In petitioners' favor, Flynn clarified at the hearing that the twenty-three hours recorded as "reading" a brief included checking and reading cases, statutes, and other materials as part of reviewing the 112-page brief. Moreover, both petitioners made statements under oath that they had understated their hours in the written submissions by at least twenty-five percent. These statements went uncontested. Furthermore, Dr. Mark Glick, a consultant on law and economics issues, testified that petitioners expended an unusually low number of hours for a case of this nature. An affidavit by Patricia A. O'Rorke, who practices law in the public utility area in Utah, testified that Flynn and Barker worked the number of hours "reasonably required to achieve the very substantial benefit conferred on the plaintiff class."

Nevertheless, one affidavit—by Gary A. Dodge, a partner specializing in utility and regulatory matters at the law firm of Kimball, Parr, Waddoups, Brown & Gee—does state that the reported hours seem "excessive" for the work performed, and the descriptions of the work performed provide too little information to decide otherwise. Yet, his testimony also suggests that Flynn's expertise should have reduced the number of hours needed, indicating that Flynn's hours were a bargain, not just reasonable. The Commission also points to occasional inconsistencies in the time records, with Barker at times recording more hours than the other participants for the same meetings.

Barker and Flynn initially accepted this case on a pro bono basis. In February 1991, they realized they could not dispose of the case as quickly as they had initially thought. At that point, they asserted a request for attorney fees. They realized that Utah had not previously allowed an award of attorney fees without statutory or contractual authorization, but because the question had never been directly addressed, they decided to pursue it. Because of this history, Barker's failure to log his time simultaneously and Flynn's general time-keeping methods are understandable. The records available do provide a sufficient basis for a determination of the hours they worked.

Although we accord the Commission limited discretion in determining the hours in this case, after reviewing the record in light of the *Cabrera* factors, we award the full amount of hours claimed by Flynn [3] and all but 9.5 hours claimed by Barker.[4] The evidence presented simply does not support the Commission's arbitrary twenty-five percent reduction. Considering, as required by *Cabrera*, the novelty and difficulty of the questions in *Stewart*, petitioners' hours are entirely reasonable. The Commission found that the case was not novel or difficult in view of one of Flynn's comments—that the issues at the Commission level were clear-cut in his clients' favor. Aside from the obvious observation that most advocates find the law "clear" in their favor, the Commission's position also ignores Flynn's testimony that a novel question of mootness arose at the appellate level, requiring much work. In addition, the attorney fees issue itself was clearly novel for Utah, as discussed by the court in *Stewart*. 885 P.2d at 782. A reading of *Stewart* further indicates that many issues were at least complex, if not novel. Moreover, as noted in *Stewart*, the complete lack of support from the Committee of Consumer Services and the actions of the Division and the Commission generally made this case very difficult. *See generally id.*

Furthermore, Flynn adequately explained why some of his hours, which appeared excessive at first glance, actually constituted reasonable work (such as the brief "reading" example described earlier). With regard to experience, Flynn's expertise in the areas of both state constitutional law and utility law and Barker's knowledge of utility law convince us that less knowledgeable attorneys performing the same work would have taken much longer. Moreover, we do not believe that anything in the financial arrangements between petitioners and their clients caused petitioners to expend excessive hours on the

case. Flynn and Barker knew very well the possibility of receiving no remuneration for their time and work. Such knowledge would surely motivate efficiency rather than the reverse.

The inconsistencies between times recorded in Barker's records and those of Flynn and a paralegal are of some concern; they may be attributable to the fact that Barker did not keep contemporaneous records, as Flynn did. Thus, we reduce Barker's hours to reflect the hours spent by other members of the litigation team at the same meetings.[5] With this adjustment, we can confidently conclude that Barker claimed a reasonable number of hours.

### B. Failure to Use a Multiplier

■ The Commission further argues that the number of hours times the hourly rate of each attorney equals a reasonable attorney fee and that it correctly refused to increase that amount by a multiplier.

Petitioners argue that the Commission had to increase the total fee by a multiplier to account for their risk of nonpayment, the results they obtained, the complexity of the case, the burdens undertaken, the efficiency of service, and the delay in compensation. They argue that the *Stewart* decision established the law of the case, specifically finding that all these factors were present and thus mandating the application of a multiplier.

■ As stated above, we consider five factors in awarding a multiplier: (1) the quality of work performed, (2) the contingent nature of the case, (3) the plaintiff's burden, (4) the risks assumed, and (5) delay in payment. The Commission made no findings of fact on the quality of work performed, but it did, by implication, account for the quality of petitioners' work in large measure when it approved the hourly rates petitioners requested. The record reflects that the rates Barker and Flynn requested rank among the highest in Salt Lake City. They can charge such amounts in part because of the overall

---

**3.** 1607.25 hours.

**4.** 451 hours.

**5.** Treating all discrepancies in favor of Flynn and the paralegal who kept contemporaneous records, we reduce Barker's claim of 460.5 hours by 9.5 hours.

quality of their work as evidenced by their reputations. In considering use of a multiplier, we do not intend to reward them twice for the same quality. Instead, when considering whether to award a multiplier for the quality of the work performed, we must consider whether the quality of work in this specific case exceeded the quality of work these attorneys usually produce. *Lindy,* the case originating the lodestar method, suggests the following considerations in making this determination:

> 1. The result obtained ..., evaluated in terms of (a) the potential money damages available to the class member, *i.e.,* a comparison of the extent of possible recovery with the amount of actual verdict or settlement; (b) the benefit—monetary or nonmonetary—conferred on the class....
>
> 2. An evaluation of the professional methods utilized in processing the case,—rewarding the use of efficient methods to expedite the case and penalizing the use of methods the predominant purpose of which was to delay or obstruct the proceedings.

*Lindy,* 540 F.2d at 118. Although the second consideration has no particular relevance to this case, the first provides useful insight. Petitioners' advocacy resulted in a refund to ratepayers of $4,630,164, including interest. Considering that even when this court disposed of the *Stewart* case in 1994, we still did not know whether the ratepayers would receive any money, *Stewart,* 885 P.2d at 783, this result is quite remarkable. In addition to monetary benefits, the ratepayers received nonmonetary, permanent benefits in that USWC is precluded from seeking excessive rates well into the future, thus eliminating the need for further or continued litigation. Given these extraordinary results, petitioners are entitled to additional monetary recognition for the quality of their work. The Commission failed to recognize these results. Therefore, its decision not to award a multiplier should be disregarded.

 To determine the contingent nature of the case, *Lindy* suggests that we evaluate the last three factors: the plaintiff's burden, the risks assumed, and the delay in payment. *Lindy,* 540 F.2d at 117. At the outset, we note that the Commission deemed the initial pro bono nature of petitioners' relationship with their clients to militate against the use of a multiplier, because petitioners did not really expect to receive payment. Whether the attorneys provided their services pro bono, at a discount, or at full market rate does not effect a determination of reasonable attorney fees. *See Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); *Ramos v. Lamm,* 713 F.2d 546, 551 (10th Cir.1983). Although both these cases concern a federal civil rights statute, the rationale that justifies their findings is the same: The rule instructs courts to consider the market rate for legal services, not to reduce the rates for pro bono services or reduced costs. *See id.* Holding otherwise would only discourage lawyers from taking such cases pro bono in the future. To the contrary, we wish to encourage the kind of public service performed by Barker and Flynn in taking this case despite the huge time commitment and significant risk of nonpayment. The Commission misunderstood the law on this point. Therefore, this aspect of its decision merits no deference.

 Looking next at the question of petitioners' burden, we reiterate that the *Stewart* case involved novel and difficult questions.[6] It lasted six years, required a writ of review to the state supreme court (which took two years to decide), and included only the slightest possibility of payment. Petitioners deserve the application of a multiplier to account for the burdens this history reflects.

 Moreover, in evaluating the risks assumed, the uncertainty of payment in this case was very high; its availability was a question of first impression. In addition, petitioners had agreed to represent the ratepayers pro bono and thus could not even rely on payment contingent upon their success in court. Thus petitioners undertook significant financial risks.

Traditional contingency fee arrangements provide us with some guidance in this case, in that the burdens and risks to counsel in

---

6. *See supra* section IV.A.

contingency cases are similar. Two of petitioners' affiants contend, and respondents do not contradict, that contingency fee cases in Utah requiring appeal usually set the fee at forty percent of the recovery. By using a percentage, the contingency fee arrangement accounts for results obtained and the amount involved, as required by *Cabrera*, in addition to the factors of risk and delay in payment.

Finally, Flynn and Barker should receive some additional amount to account for the lost use of the money they would have received at the end of the case in normal contingency circumstances. In an ordinary contingency case, the percentage recovery is designed to account for the lost use of income during the course of the case. Contingency contracts, however, need not consider the extra time required in this case to settle attorney fees, and some compensation is due petitioners for the value of that loss.

 To calculate what a contingency fee would have been in this case, we take forty percent (the percentage generally charged in contingency fee cases where there is an appeal) of the $4,630,164 recovery generated by Barker and Flynn, which equals $1,852,065.60. As stated above, Flynn worked 1607.25 hours at $250 an hour, totaling $401,812.50. Barker worked 451 hours at $175 an hour, totaling $78,925. Thus petitioners' time alone is worth $480,737.50. We award a multiplier to take into consideration delay of payment, risk, quality of work, contingency, and the plaintiff's burden. However, when the common fund is quite high, as in this case, the percentage recovery should be reduced. *See Court Awarded Attorney Fees*, 108 F.R.D. at 256; *see e.g., In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1296 (E.D.N.Y.1985) (awarding over $10,000,000 in attorney fees, less than six percent of common fund). Therefore, although a multiplier of four would more closely approximate the contingency arrangement, a multiplier of 2.5, equaling $1,201,843.75, is more appropriate given the size of the fund. In light of the *Cabrera* factors, we hold that $1,201,843.75 represents a reasonable attorney fee in this exceptional case.

## C. Fifty Percent Reduction of Paralegal Fees

 This court has approved fee awards to paralegals, law clerks, and legal assistants as a way of encouraging cost-effective lawyering. *Baldwin v. Burton*, 850 P.2d 1188, 1200–01 (Utah 1993). A court must base attorney fee awards on the evidence and support them by findings of fact. *Cottonwood Mall Co. v. Sine*, 830 P.2d 266, 268 (Utah 1992).

The Commission awarded paralegal fees at $25 an hour, stating as justification that neither employee had paralegal training. One "paralegal," Funk, is a consumer advocate in utility matters. The other, McDermott, had finished his third year of law school but had not taken the bar exam when he performed the research in question. The affidavits submitted by both sides support paralegal fees of at least $45 an hour. One affidavit states that research assistants receive $60 an hour, while another identifies $35 to $50 as the going rate. The $25 figure comes from Funk's affidavit; he had done contract work for the Commission at $25 an hour.

 The record does not support the reduction in paralegal compensation to $25. The $25 rate paid to Funk by the Commission was for drafting legislation and the like, not for paralegal work. The rule discussed above requiring payment of the going rate for attorney fees applies with equal force to paralegal fees. Public agencies often pay a reduced rate, but the private rate sets the standard. Given the evidence in the record, the paralegals should have been compensated at $45 an hour at least.

However, because we have chosen to use the contingency fee to approximate payment in this case, we do not award an additional amount for paralegal fees and costs generally, because the contingency fee scenario already encompasses these amounts.

## D. Attorney Fee Litigation

 Petitioners request attorney fees for the litigation of the attorney fee issue. In their favor, they cite *Salmon*, where we stated, "[I]f a vindicated employee is required to

expend attorney fees to recover the original fees to which he was entitled, the cost of these subsequent fees must also be reimbursed." *Salmon,* 916 P.2d at 896. *Salmon,* however, is a fee shifting case. In this case, we awarded petitioners fees under the common fund theory, to prevent the beneficiaries of their efforts from receiving a benefit without having to pay for their services. The common fund theory does not justify awarding petitioners fees for litigating the amount of the fee award. *See Lindy,* 540 F.2d at 111 ("There being no benefit to the fund from services performed by [attorneys] in connection with their fee application, there should be no attorneys' fee award from the fund for those services.").

The fees we award petitioners today compensate for the benefits they achieved on behalf of the ratepayers. Their litigation of the attorney fee issue benefits only themselves; thus we conclude that they should bear the burden of that expense. That they had to litigate the issue is not the "fault" of the ratepayers, as it would be the fault of the opposing party in a fee shifting case. In a common fund case, no one is being "punished." Rather, all parties must simply bear their own burden. Thus we hold that as a matter of law, petitioners must pay their own costs for their litigation of the attorney fee issue.

We award petitioners $1,201,843.75 less costs and fees of $370,576.30 paid pursuant to the Commission order to compensate for their costs and fees relating to the *Stewart* case.

STEWART and RUSSON, JJ., concur in Justice DURHAM's opinion.

HOWE, Associate Chief Justice, dissenting:

I dissent. I would affirm the award of attorney fees made by the Commission.

Although the majority professes "our complete confidence in the professionalism of the Commission," it then proceeds to accord no confidence in its award of fees by reversing the Commission on every determination of fact and law made by it.

The majority departs from our general rule of reviewing awards of fees under an abuse of discretion standard and instead imposes a heightened standard, not because of any bias demonstrated by the Commission but because there is "a potential for the appearance of bias."

The setting of fees here by the Commission is not different from the everyday occurrence in the trial courts, where trial judges who have been reversed on appeal are called upon to fix a reasonable fee for the attorney who prosecuted the appeal and was responsible for reversing the judge. Yet we have never presumed that the judge could not be fair in such a situation and imposed a heightened scrutiny in reviewing the judge's award. We should not treat the Commission differently. The members are entitled to our respect and confidence, and we should not review their work with suspicion. So far as I know, we have never reversed a judgment simply because "there is a potential for the appearance of bias." We have always required that bias be demonstrated. That has not been done here.

The award of fees made by the Commission is well supported by the evidence, which has always been the standard by which we have reviewed awards of fees. While the majority recites evidence supporting the Commission's award, it gives no weight to that evidence. Instead, the majority makes a de novo determination of the factual issues which the Commission made in setting a reasonable fee. For example, the Commission reduced by twenty-five percent the number of hours for which the attorneys should be compensated. This reduction was made because the attorneys' time records lacked meaningful detail; Barker reconstructed his time spent on the case; two attorneys spent time on the same task; the records reflected inconsistencies in time billed for the same task; and the time billed for certain tasks appeared excessive on its face. In any other case, this explanation would suffice, and we would not hesitate to affirm the award made. But here, even though the explanation is

supported by the affidavit of Gary A. Dodge, a capable practicing attorney, the majority rejects the Commission's explanation because Barker and Flynn testified that they had understated their hours by at least twenty-five percent and observes that their testimony went uncontested. Of course it went uncontested; it was subjective and incapable of being challenged by anyone. But the Commission as the fact finder was not required to believe their testimony. Nevertheless, the majority reverses the Commission on disputed facts and substitutes themselves as the fact finders.

In a similar manner, the majority reverses the Commission's determination that $25 per hour was a reasonable rate for Funk and McDermott, who were not paralegals. Indeed, Funk had done work for the Commission at $25 per hour, and McDermott was a law student. Yet the majority rejects this reasoning of the Commission and awards them "$45 an hour at least," the rate for paralegals, which they admittedly were not. Again, the majority rolls over the Commission's factual determination.

The majority recognizes that "the rates Barker and Flynn requested rank among the highest in Salt Lake City." Barker will receive $175 for every hour requested except for the 9.5-hour token reduction made by the majority. Flynn will receive $250 per hour for every hour he requested. But it seems that is not enough. The majority then proceeds to apply a multiplier of 2.5.

I do not discount the value of the service provided by the attorneys. They deserve to be fairly compensated. But when they are awarded compensation for almost every hour they requested, even though their time records were subject to question and they are paid at the highest rates known in this community, I fail to see the necessity of or fairness in applying a multiplier. The attorneys took the case on a pro bono basis and had no agreement with anyone for a fee. They are to be commended for their public spirit and hard work. I would leave them with their handsome fee determined without

a multiplier and would not shower them with a windfall.

ZIMMERMAN, C.J., concurs in Associate Chief Justice HOWE's dissenting opinion.