**2023 UT 13**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

VOTE SOLAR,
*Petitioner,*

*v.*

PUBLIC SERVICE COMMISSION OF UTAH,[1]
*Respondents*

No. 20210041
Heard September 12, 2022
Filed June 22, 2023

On Petition from the Public Service Commission of Utah

Public Service Commission
No. 17-035-61

Attorneys:[2]

Brian W. Burnett, Salt Lake City, Jennifer M. Selendy,
Philippe Z. Selendy, Caitlin J. Halligan, Joshua S. Margolin,
Lauren J. Zimmerman, Hannah O. Belitz, Samuel R. Breidbart,
New York, NY, for petitioner

Michael J. Hammer, Salt Lake City, for respondent Public Service
Commission of Utah

Emily L. Wegener, Stephen K. Christiansen, Heidi K. Gordon,
Salt Lake City, for respondent Rocky Mountain Power

Sean D. Reyes, Att'y Gen., Stanford E. Purser, Deputy Solic. Gen.,
Erin T. Middleton, Patricia E. Schmid, Asst. Solic. Gens., Salt Lake
City, for respondent Utah Office of Consumer Services

---

[1] Other respondents to this review are: ROCKY MOUNTAIN POWER, UTAH OFFICE OF CONSUMER SERVICES, and UTAH DIVISION OF PUBLIC UTILITIES.

[2] Amicus Curiae: Hunter H. Holman, Salt Lake City, for Utah Clean Energy; Stephen F. Mecham, Salt Lake City, for Solar Energy Industries Association

Sean D. Reyes, Att'y Gen., Justin C. Jetter, Spl. Asst. Att'y Gen., Robert J. Moore, Steven W. Snarr, Asst. Att'y Gens., Salt Lake City, for respondent Utah Division of Public Utilities

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the Court in which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN, JUSTICE HAGEN, and JUSTICE POHLMAN joined.

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 In 2002, the Utah Legislature mandated that the Public Service Commission (PSC) create a "net metering" program for customers who also generate electricity. This prompted the PSC to order utility companies to implement a net metering system. The net metering system compensated consumers who installed solar panels for the excess power they exported to the electric grid. In 2014, the Legislature required the PSC to evaluate the costs and benefits of the net metering program and, if necessary, modify the program based on those findings. UTAH CODE § 54-15-105.1. In 2017, the PSC entered into a settlement agreement with major stakeholders. As part of the settlement agreement, the parties stipulated to the creation of an "export credit rate" system, which would eventually replace the net metering program.

¶2 The PSC then engaged in a lengthy public process to decide what factors it should consider to calculate the export credit rate (ECR). Several parties, including Vote Solar, testified and presented evidence. In October 2020, the PSC issued an order that set forth the inputs it would use to calculate the ECR (October Order). The October Order also set an initial ECR. Vote Solar, among others, moved the PSC to reconsider the inputs it would incorporate into the rate, the appropriateness of calculating the rate at all, whether it was arbitrary and capricious for the PSC to annually update the rate, and whether the PSC's decision to have unused credits expire annually was arbitrary and capricious.

¶3 In December 2020, the PSC denied in part and granted in part the motions for reconsideration (December Order). The PSC agreed to reconsider some of the components of the ECR calculation but made clear that it would not revisit other aspects of the October Order. Vote Solar seeks review of the December Order.

¶4 The PSC then held hearings during which it accepted additional testimony and evidence on those aspects of the ECR that the PSC had agreed to reconsider. In April 2021, the PSC adjusted the ECR formula and recalculated the ECR (April Order). Vote Solar does not seek review of the April Order.

¶5 Vote Solar asks us to reverse a number of the decisions the PSC announced in the December Order. Vote Solar principally argues that we should set that order aside because the PSC did not comply with multiple statutory mandates when it discontinued the net metering program and set the initial ECR. Vote Solar also contends that the PSC's decisions were not supported by substantial evidence.

¶6 The Office of Consumer Services (OCS) moves to dismiss Vote Solar's petition for review, arguing that our jurisdiction extends only to the PSC's final agency action and that the December Order was not final agency action. Rocky Mountain Power (RMP) joins in OCS's motion.

¶7 We grant OCS's motion in part and deny it in part. We cannot reach the substance of Vote Solar's arguments concerning three of the issues decided in December 2020 because the Administrative Procedures Act limits our review to "final agency action." UTAH CODE § 63G-4-403(1). The following decisions, from the December Order, were not final agency actions: that the PSC had met its statutory burden to analyze costs and benefits of net metering, that the PSC would only analyze cost-of-service costs and benefits in creating the ECR, and that integration costs should be included in the ECR calculation. For ease of reference, we refer to these as the ECR Calculation Decisions. We therefore lack jurisdiction and have no choice but to dismiss the petition as to these issues.

¶8 We deny OCS's motion with respect to two issues decided in the December Order: the decision to annually update the ECR and the decision to require that unused credits expire. For ease of reference, we refer to these as the ECR Operation Decisions. The December Order represented the PSC's final agency action on these issues. When we turn to the merits of Vote Solar's arguments on these decisions, we conclude that the PSC did not exceed the bounds of its authority, and we affirm the PSC.

## BACKGROUND

¶9 The Utah Legislature enacted the "Net Metering Statute" in 2002. That statute required utility companies to buy back excess power from customers who generate their own electricity. UTAH

CODE §§ 54-15-102, -103. The statute mandated that this be implemented through a "net metering program." *See id.* §§ 54-15-102(12), -103(1). Under the net metering program, customers who generated excess power (Customer Generators) could cancel out the amounts they would have been billed by exporting unused energy to the electric grid. *See id.* §§ 54-15-102(2)–(3), -104(3). Customer Generators also received credits for any exported energy that exceeded the Customer Generators' use. *Id.* §§ 54-15-102(12)(c), -104(3). These credits expired at the end of each year. *Id.* § 54-15-104(3)(a)(ii).

¶10 The Net Metering Statute also required that the value of the credits for exported power equal at least the utility company's "avoided cost," although the statute gave the PSC discretion to mandate a more generous credit to Customer Generators. *Id.* §§ 54-15-102(8)(b), -104(3)(a)(i). The original statute allowed an electric company to cap the number of Consumer Generators who could participate in the net metering program if the total energy generating capacity from customer generation systems reached 0.1% of the company's peak demand during 2001. *See id.* § 54-15-103(2). The Net Metering Statute was amended in 2008 to change the allowable cap to 0.1% of peak demand in 2007 and to permit the PSC to raise this cap. *Id.* § 54-15-103(2)–(3).

¶11 In 2009, the PSC changed the net metering program in two important ways. It increased the credit for exported power, and it raised the cap on the net metering program to 20% of peak demand in 2007. Participation in the net metering program soared.

¶12 As the net metering program's popularity increased, RMP and other organizations expressed concern that the net metering program was shifting the program's costs onto ratepayers who did not participate in the program. This apparently motivated the Legislature's 2014 decision to amend the Net Metering Statute to require the PSC to evaluate the costs and benefits of the net metering program. *See* UTAH CODE § 54-15-105.1(1). The Legislature also instructed the PSC to create a "just and reasonable charge, credit, or ratemaking structure." *Id.* § 54-15-105.1(2).

¶13 The PSC responded to this legislative mandate by opening a docket to examine different ways to compensate Customer Generators for the energy they exported. Multiple parties—including Vote Solar—participated in discussions with the PSC. These discussions culminated in a stipulated settlement agreement reached between several key parties, including RMP, OCS, the Division of Public Utilities, Vivint Solar, and the Utah Solar Energy Association.

Vote Solar did not sign the settlement agreement, but it also explicitly declined to object to the settlement.[3] The PSC approved the terms of that settlement agreement in a 2017 order.

¶14 The PSC-approved settlement required utility companies to implement an export credit rate to compensate Customer Generators.[4] Although the settlement agreement stipulated to an ECR, it did not address how the PSC should calculate that ECR.[5] Over the course of the next three years, the PSC heard testimony, took evidence, and invited public comment on what factors it should use to calculate the ECR. In October 2020, the PSC issued an order that, among other things, identified what it considered to be the relevant inputs and calculated an ECR based on those inputs.[6]

---

[3] A settlement agreement appears to be a term of art in this setting. It refers to a tool for utility rate-making and involves the regulatory authority seeking the agreement of many key stakeholders. Agency-approved, non-unanimous settlement to facilitate utility rate-making has been commonly used in the United States for decades. Stefan H. Krieger, *Problems for Captive Ratepayers in Nonunanimous Settlements of Public Utility Rate Cases*, 12 YALE J. ON REG. 257, 279–85 (1995). We approved the practice in 1983. *Utah Dep't of Admin. Servs. v. Pub. Serv. Comm'n*, 658 P.2d 601, 615–16 (Utah 1983).

[4] The order approving the settlement stipulation, issued in 2017, stated that the PSC had not yet met its statutory burden of analyzing the costs and benefits of the net metering program but would do so in the future.

[5] The settlement additionally provided that Customer Generators who had entered the net metering program between its 2002 inception and a few weeks after the PSC's approval of the 2017 settlement could remain in the program until 2035. The 2017 order, in line with the stipulated settlement, also created a "transition program" for Customer Generators who began exporting excess energy to the grid between the 2017 settlement agreement and the creation of an ECR.

[6] The October Order recited that it fulfilled the Net Metering Statute's requirement that the PSC examine the costs and benefits of the net metering program. However, the PSC noted in the Order that it did not take a position on whether the statute, which required the PSC to evaluate the costs and benefits of net metering and create a

<span style="float:right">(continued . . .)</span>

¶15 More specifically, the PSC ruled that it would calculate the ECR based on integration costs, avoided energy costs, avoided generation costs, avoided transmission costs, and avoided distribution capacity costs.

¶16 To the disappointment of many, including Vote Solar, the PSC also concluded that it would be inappropriate to include factors other than the cost-of-service in the ECR calculation.[7] The PSC reasoned that, while it recognized "the importance of environmental considerations, carbon policy, economic development, and public health, these matters fall within the regulatory ambit of other government agencies."

¶17 In November 2020, Vote Solar and RMP—among others—moved for reconsideration of the October Order. Vote Solar asked the PSC to revisit several aspects of the ECR calculation. Vote Solar wanted the PSC to reconsider the method of calculating avoided energy, the method of calculating avoided capacity cost, the decision to include integration costs in the calculation, and the PSC's decision to not include non-economic factors in the ECR. Vote Solar also asked the PSC to reconsider its decision to have unused credits expire annually and its decision to recalculate the ECR every year.

¶18 In December 2020, the PSC granted in part and denied in part the requests for reconsideration. The PSC refused to reconsider the portions of the October Order that Vote Solar had challenged. But the PSC ordered rehearing on two of the issues RMP had asked it to reconsider. The PSC left in place the ECR it set in October and declared the order final with respect to any issue it was not rehearing.

¶19 The PSC then took additional testimony and evidence and issued a new order in April 2021. This order changed the ECR formula and recalculated the ECR based on the updated formula.

---

new compensation program based on that evaluation, applied to the creation of an ECR.

[7] We have noted that a "rate based on cost of service means a rate sufficient to pay operating costs plus the cost of a fair return to investors for providing capital, both equity and debt." *Stewart v. Utah Pub. Serv. Comm'n*, 885 P.2d 759, 771 (Utah 1994) *superseded on other grounds by* UTAH CODE § 78B-5-825.5, *as recognized in Laws v. Grayeyes*, 2021 UT 59, ¶¶ 50, 54, 498 P.3d 410.

¶20 Vote Solar seeks review of five issues decided in the December Order: (1) whether the PSC met its statutory burden to analyze the costs and benefits of net metering before creating the ECR, (2) whether the PSC was required to include benefits other than cost-of-service in creating its ECR calculation, (3) whether it was proper to include integration costs in the ECR calculation, (4) whether the ECR should be updated annually, and (5) whether the ECR credits should expire at the end of each year.

¶21 OCS—in a motion RMP joins—moves to dismiss Vote Solar's petition, arguing that we lack jurisdiction to hear the petition because the December 2020 order was not a final agency action that confers jurisdiction on us. We indicated that we would hear the motion to dismiss at the same time that we held arguments on the merits of the petition.

### STANDARD OF REVIEW

¶22 OCS's challenge to our subject matter jurisdiction presents an issue that we will decide in the first instance. As such, we have no ruling to review, and no standard of review applies.

¶23 The two issues we address on the merits—Vote Solar's challenges to the PSC's decisions to annually update the ECR and to require unused credits to expire—contain different categories of questions which require their own analysis on the appropriate standards of review.

¶24 This analysis begins with the standards established by the Administrative Procedures Act. The Act "sets forth the type of agency actions for which we may grant relief," but some sections "do[] not expressly mandate the standards of review we must employ when reviewing those actions." *Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 18, 308 P.3d 461; *see also* UTAH CODE § 63G-4-403. When a standard is not expressly mandated, "the applicable standard of review will depend on the nature of the agency action." *Murray*, 2013 UT 38, ¶ 22.

¶25 Vote Solar's challenge to annually updating the ECR contains two sub-issues. The first is the PSC's determination that Customer Generators and other non-power-generating residential customers constitute different classes of customers. This presents a fact-like mixed question of fact and law. Without a clear standard of review from the statute, "we apply our traditional standards of review." *Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 9, 345 P.3d 1242. "[W]e review fact-like mixed questions deferentially." *Randolph v.*

*State*, 2022 UT 34, ¶ 24, 515 P.3d 444; *see also Sawyer v. Dep't of Workforce Servs.*, 2015 UT 33, ¶ 11, 345 P.3d 1253.

¶26 The second sub-issue challenges the PSC's determination that the ECR should update annually. Vote Solar contends that this determination lacks factual support. The Administrative Procedures Act "authorizes appellate courts to grant relief where an 'agency action is based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court.'" *Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8 (quoting UTAH CODE § 63G-4-403(4)(g)). Accordingly, "a challenge to an administrative agency's finding of fact is reviewed for substantial evidence." *Id.*

¶27 Vote Solar likewise challenges the PSC's decision to require unused credits to expire as lacking evidentiary support. We review that under the Act's substantial evidence standard as well.

## ANALYSIS

¶28 OCS claims that we lack jurisdiction because the December Order was not final agency action. OCS argues that the agency action at the heart of the PSC docket established a formula for an ECR, and then calculated that ECR. OCS posits that there could not be final agency action until the PSC had resolved the motion for rehearing, decided what components it would use to calculate the ECR, and then recalculated the ECR based on that formula.

¶29 Our jurisdiction comes from the Utah Constitution. Article VIII, section 3 of the Utah Constitution vests this court with jurisdiction over extraordinary writs and questions certified from the federal court. Section 3 also provides that the Supreme Court "shall have appellate jurisdiction over all other matters to be exercised as provided by statute." UTAH CONST. art. VIII, § 3.

¶30 The Legislature has defined the Supreme Court's appellate jurisdiction over "final orders and decrees in formal adjudicative proceedings originating with . . . the Public Service Commission." UTAH CODE § 78A-3-102(3)(e)(i). The Administrative Procedures Act further refines this court's appellate jurisdiction to review an agency's formal adjudicative proceeding as jurisdiction over "final agency action." *Id.* § 63G-4-403(1).[8] The Legislature has not

---

[8] An astute reader might question why this court focuses on the "final agency action" language of the Administrative Procedures Act when Utah Code section 78A-3-102(3)(e)(i) gives us jurisdiction over

(continued . . .)

statutorily defined final agency action. And we appear to have had surprisingly few opportunities to examine what it means for an agency's action to be final. Because much of our analysis will turn on what it means to be "final agency action," we take a few paragraphs to examine how our case law on that question has developed.

¶31 We first took up the question in *Barker v. Utah Public Service Commission*, 970 P.2d 702 (Utah 1998). There, we were presented with the question of whether the PSC's award of attorney fees was final agency action. *Id.* at 705.

¶32 In litigation that preceded the dispute at issue in *Barker*, a group of ratepayers had asked for review of a PSC rate-making decision and sought an award of the fees they had incurred challenging the rate in front of the Commission and this court. *Stewart v. Utah Pub. Serv. Comm'n*, 885 P.2d 759, 781–84 (Utah 1994), *superseded on other grounds by* UTAH CODE § 78B-5-825.5, *as recognized in Laws v. Grayeyes*, 2021 UT 59, ¶¶ 50, 54, 498 P.3d 410. We agreed with the ratepayers and remanded. *Id.* at 762, 784. We also awarded the ratepayers their attorney fees and instructed the PSC to "determine the amount of time reasonably expended by [the ratepayers'] attorneys on the issues before the Commission and on appeal upon which [the ratepayers] have prevailed." *Id.* at 783.

¶33 In *Barker*, the ratepayers challenged the PSC's order awarding attorney fees. *Barker*, 970 P.2d at 704–05. The ratepayers argued that the PSC had unreasonably discounted the fees they incurred. *Id.* at 705, 709. The PSC argued that the attorney fee award was not final because the PSC was rehearing the calculation of a refund to its customers that flowed from our decision in *Stewart*. *Barker*, 970 P.2d at 705–06. We rejected that argument, concluding that the reconsideration of the refund order had no bearing on the attorney fee award. *Id.*

---

"final orders . . . originating with" the PSC. This is because Utah Code section 78A-3-102(6) states that "[t]he Supreme Court shall comply with the requirements of Title 63G, Chapter 4, Administrative Procedures Act, in its review of agency adjudicative proceedings." We have interpreted this to mean that our jurisdiction is premised on final agency action, as that term is used in the Administrative Procedures Act. *See, e.g., Union Pac. R.R. Co. v. Utah State Tax Comm'n*, 2000 UT 40, ¶¶ 11–16, 999 P.2d 17.

¶34 Along the way, we defined "final agency action." We drew on United States Supreme Court precedent and the Model State Administrative Procedures Act to craft a definition. *Id.* at 705-06.

¶35 We first explained the holding of the then-current United States Supreme Court precedent regarding the Administrative Orders Review Act, 28 U.S.C. § 2342 (1988):

> The relevant considerations in determining finality are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action.

*Barker*, 970 P.2d at 706 (cleaned up) (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

¶36 We then noted that "the Model State Administrative Procedure Act defines final agency action negatively as 'the whole or a part' of any action which is not 'preliminary, preparatory, procedural, or intermediate with regard to subsequent agency action of that agency or another agency.'" *Id.* (quoting 1981 Model State Admin. P. Act § 5-102(b)(2)).

¶37 Two years later, we took up the question in *Union Pacific Railroad Co. v. Utah State Tax Commission*, 2000 UT 40, 999 P.2d 17. In *Union Pacific*, a railroad company challenged the Utah State Tax Commission's Property Tax Division's valuation of its properties, first before the Tax Commission, then before the court. *Id.* ¶¶ 4–9. The Commission issued four orders. *Id.* ¶¶ 4–7. The first order decided the initial challenge but allowed twenty days for a motion for reconsideration. *Id.* ¶ 4. The parties moved for reconsideration, and the Tax Commission issued a second order based on that proceeding, again allowing twenty days to file a motion for reconsideration. *Id.* ¶ 5. After the second order, an untimely challenge to the first order led to a third order from the Commission. *Id.* ¶¶ 5–7. The third order stated that the time for rehearing of the first order had elapsed and did not allow for reconsideration before the Tax Commission, only a petition for review to this court or the district court. *Id.* ¶ 6 & n.2. The parties then moved for reconsideration on the second order, and the Commission's fourth order denied that motion and, like the third order, did not allow for agency reconsideration, only review by this court or the district court. *Id.* ¶ 7.

¶38 Union Pacific sought review of the fourth order, petitioning for review in both the district court and this court, although both petitions came well after the thirty-day deadline. *Id.* ¶ 8. The district court dismissed for lack of subject matter jurisdiction. *Id.* ¶ 9. Union Pacific argued before us that the fourth order was not "final agency action," and therefore it was not required to have sought review within the thirty-day window. *Id.* ¶ 10. Union Pacific asked us to remand to the Tax Commission "for issuance of a final order" that would constitute final agency action and trigger our jurisdiction and Union Pacific's time to petition for review. *Id.*

¶39 In *Union Pacific*, we expanded upon *Barker* and articulated the test for "final agency action":

> (1) Has administrative decisionmaking reached a stage where judicial review will not disrupt the orderly process of adjudication?;
>
> (2) Have rights or obligations been determined or will legal consequences flow from the agency action?; and
>
> (3) Is the agency action, in whole or in part, not preliminary, preparatory, procedural, or intermediate with regard to subsequent agency action?

*Id.* ¶¶ 15–16.

¶40 We explained that "[a]gency actions that meet the foregoing test are appealable from the date of the order's issuance until the last day to appeal the *last* final agency action in the case." *Id.* ¶ 16 (cleaned up).

¶41 The *Union Pacific* court held that the Tax Commission's fourth order was final and that the petitioner had missed the deadline to seek review. *Id.* ¶ 24. When we analyzed whether ruling on the fourth order would disrupt the "orderly process of adjudication," we emphasized that "by denying reconsideration of its earlier findings and conclusions, the Tax Commission reached the end of its decisionmaking process." *Id.* ¶ 19.

¶42 We further held that "rights or obligations" had been determined because the order affirmed the railroad's tax obligations. *Id.* ¶¶ 16, 20. We also opined that the order was not "preliminary, preparatory, procedural, or intermediate" because it "did not remand the valuation issues for further proceedings[,] nor . . . deny motions to dismiss. Instead, . . . [it] denied requests to reconsider the Tax Commission's holdings . . . and ended its decisionmaking process by leaving no issues unresolved." *Id.* ¶ 21.

¶43 Our next opportunity to examine what final agency action means came in a case in which we reviewed a court of appeals decision applying the *Union Pacific* test: *Ameritemps, Inc. v. Utah Labor Commission* (*Ameritemps*) 2007 UT 8, 152 P.3d 298, *aff'g Ameritemps, Inc. v. Labor Commission*, 2005 UT App 491, 128 P.3d 31.

¶44 In that case, a worker sought compensation for an on-the-job injury. *Ameritemps, Inc. v. Labor Comm'n*, 2005 UT App 491, ¶¶ 2–3, *aff'd sub nom Ameritemps, Inc. v. Utah Labor Comm'n*, 2007 UT 8. The worker's employer sought review of the Labor Commission's conclusion that he had suffered permanent, total disability. *Id.* ¶¶ 5–6. The employer argued that there could be no judicial review of the order designating disability because the determination was not final under the Workers' Compensation Act until the Commission ruled on a reemployment plan. *Id.* ¶¶ 9, 12 (citing UTAH CODE § 34A-2-413 (2005)).

¶45 The court of appeals applied the *Union Pacific* test and held that review of the order would not disrupt the orderly process of adjudication because the Labor Commission had denied reconsideration on the finding of disability. *Id.* ¶ 20. The court of appeals reasoned that the disability analysis was distinct from the analysis the Labor Commission would conduct to approve the reemployment plan. *Id.*

¶46 The court of appeals held the second factor was met because the Labor Commission had determined rights or obligations when disability payments had begun based on the order. *Id.* ¶ 21.

¶47 The court of appeals also held that the order declaring the worker permanently disabled was not "preliminary, preparatory, procedural, or intermediate" because it "decide[d] permanent total disability with finality." *Id.* ¶¶ 22–23. The court pointed out that in *Barker*, we provided examples of orders that are "preliminary, preparatory, procedural, or intermediate," namely a "remand for further proceedings," "an order converting informal proceedings to formal" proceedings, and an order denying a motion to dismiss. *Id.* ¶ 22 (quoting *Barker*, 970 P.2d at 706). The court of appeals did not think that any of these examples were analogous to the Labor Commission's disability determination. *See id.* ¶ 23.

¶48 We affirmed the court of appeals. *Ameritemps*, 2007 UT 8, ¶¶ 10, 13. In our opinion, we noted that the parties had not adequately briefed the jurisdictional issue, even though it was the only issue on which we had granted certiorari. *Id.* ¶ 11. We wrote: "For the most part, the parties disregarded the question on which we

granted certiorari, and they treated superficially, if at all, the rule of law at issue." *Id.*

¶49 Despite the absence of briefing, we adopted the court of appeals' analysis whole cloth because "the clarity and correctness of the court of appeals' analysis was sufficient to allow us to resolve any misunderstanding that may have existed about the current state of the law." *Id.* ¶ 12.[9] We thus concluded that the order determining disability constituted final agency action. *Id.* ¶¶ 10, 13.

¶50 Our most recent application of the *Union Pacific* test can be found in *Heber Light & Power Co. v. Utah Public Service Commission*, 2010 UT 27, 231 P.3d 1203. There, we applied the *Union Pacific* test to a PSC scheduling order. *Id.* ¶¶ 7–12.

¶51 Heber Light & Power (Heber Light) is a municipal power company that was purveying power outside of its authorized bounds. *Id.* ¶ 3. RMP filed a complaint with the PSC to prevent Heber Light from continuing the practice. *Id.* ¶ 1. Heber Light moved to dismiss, arguing that the PSC lacked jurisdiction because Heber Light is not a public utility and is therefore outside the PSC's jurisdiction. *Id.* The PSC denied that motion and entered a scheduling order indicating it had jurisdiction over the issue. *Id.* Heber Light sought review. *Id.* ¶ 2.

¶52 We applied the *Union Pacific* test and concluded that the scheduling order failed all three inquiries. *Id.* ¶¶ 8–12. We first held that hearing a challenge to the scheduling order would disrupt the orderly process of adjudication. *Id.* ¶ 9. We reasoned that the PSC had not yet decided the substantive issues, because it had only concluded that it had jurisdiction. *Id.* ¶¶ 8–9. We wrote: "Far from ending the administrative process, the order signaled the beginning of the process, a process that would be disrupted were Heber Light allowed to appeal." *Id.* ¶ 9.

---

[9] *Ameritemps* is our precedent, precedent that no party has challenged. We note, however, that our decision there appears to have been influenced by the shabby briefing the parties provided. *See Ameritemps*, 2007 UT 8, ¶¶ 11–12. We certainly did not show our work in that decision nor explain why we thought the court of appeals was correct. This causes us to view *Ameritemps* with a little caution and leaves us a bit wary of any lessons we might try to draw from the case.

¶53 We opined that the scheduling order did not determine rights or obligations. *Id.* ¶ 10. And we held that the order was "[p]reliminary, [p]reparatory, [p]rocedural, or [i]ntermediate," because it was a denial of a motion to dismiss. *Id.* ¶¶ 11–12. We noted that "the Commission was still in the process of adjudicating the dispute after the order was issued." *Id.* ¶ 11.

¶54 It is this case law that OCS draws upon to argue that the December Order is not final agency action. More specifically, OCS argues that the December Order fails the first and third parts of the *Union Pacific* test. OCS contends that the December and April Orders each ultimately set an ECR, so if Vote Solar seeks review of the December Order but not the April Order, the orderly process of adjudication will be disrupted. OCS also argues that the December Order was "preliminary, preparatory, procedural, or intermediate" because it granted a rehearing on issues that would impact the ultimate (and still not fully decided) calculation of the ECR.

¶55 We partially agree with OCS. When we run the December Order through the *Union Pacific* test, we see that the PSC had not taken final action on those issues necessary to calculate the ECR. This means we lack jurisdiction to consider Vote Solar's challenges centered on whether the PSC analyzed the costs and benefits of net metering before creating the ECR, whether the Net Metering Statute required the PSC to include benefits other than cost-of-service in the ECR calculation, and whether the PSC could properly include integration costs in the ECR. As noted above, we refer to these as the ECR Calculation Decisions.

¶56 The PSC did take final agency action in the December Order on two of the issues Vote Solar challenges. The PSC reached the end of its decision-making on whether the ECR should be updated annually and on whether the ECR credits should expire at the end of each year. We refer to these as the ECR Operation Decisions.

## I. THE DECEMBER 2020 ORDER WAS INTERMEDIATE WITH REGARD TO SUBSEQUENT PSC ACTION ON THE ECR CALCULATION DECISIONS

¶57 OCS argues that the December Order was "preliminary, preparatory, procedural, or intermediate with regard to subsequent agency action," and thus is not final agency action. (Quoting *Union Pac. R.R. Co. v. Utah State Tax Comm'n*, 2000 UT 40, ¶ 16, 999 P.2d 17.) OCS contends that because the December Order granted a motion to reconsider aspects of the ECR, and because a new ECR was set in

April, the December Order was intermediate in the truest sense of the word.

¶58 Vote Solar argues that the December Order was final because the PSC had "reached the end of its decision-making process" on those components of the ECR it challenges in this court. (Quoting *Barker v. Utah Pub. Serv. Comm'n*, 970 P.2d 702, 706 (Utah 1998).)

¶59 We see it differently and conclude that the December Order was an intermediate order as to the ECR Calculation Decisions. A number of Vote Solar's challenges focus on the way the PSC intended to calculate the ECR. Vote Solar asks us to review whether the PSC has met its statutory burden to weigh the costs and benefits of net metering and the PSC's decision to include integration costs, and to not include non-economic factors in the ECR. Each of these is a challenge to the validity or outcome of the ECR calculation. Because the PSC granted a motion to reconsider aspects of the ECR's calculation, the PSC did not take final action on the ECR Calculation Decisions until the April Order.

¶60 Vote Solar claims that our case law dictates a contrary result. It argues that "Utah courts have consistently held that an agency order is final agency action where it decides certain issues with finality and leaves others unresolved." Vote Solar contends that the issues it challenges from the December Order are "discrete components" of the ECR calculation that can be used to "calculat[e] an output." That is true as far as it goes, but it fails to tell us what issues in the December Order were decided with finality.

¶61 The cases Vote Solar makes the centerpiece of its arguments are not much help to it either. Neither of the orders we examined in *Barker* and *Ameritemps* were intermediate the way the ECR Calculation Decisions are here.

¶62 The *Barker* order concerned attorney fees that would not be changed when the PSC reheard the refund calculation. *Barker*, 970 P.2d at 705; *see supra* ¶¶ 31–36. Similarly, nothing the Labor Commission did with the reemployment plan in *Ameritemps* would modify the substance of the challenged order: a determination that the Ameritemps employee had suffered a permanent, total disability. *Ameritemps, Inc. v. Labor Comm'n*, 2005 UT App 491, ¶ 23, 128 P.3d 31, *aff'd sub nom. Ameritemps, Inc. v. Utah Labor Comm'n*, 2007 UT 8, 152 P.3d 298; *see supra* ¶¶ 43–49. These orders were not intermediate because—while the orders were related to other issues being litigated—those ongoing issues did not depend on—or potentially change based on—the outcome of the orders' review.

¶63 Such is not the case here. Many of the issues decided in the December Order could flow into the issues that the PSC was rehearing. For example, the PSC calculated the ECR in the April Order by applying the integration costs the PSC identified in the December Order. But the October and December ECR also factored in some inputs that the PSC reconsidered in the April Order.

¶64 Similarly, Vote Solar challenges whether the PSC analyzed the costs and benefits of net metering before creating the ECR and whether the Net Metering Statute required the PSC to include benefits other than cost-of-service in the ECR calculation. Although the PSC strongly signaled the fate of those issues when it refused to rehear them, there was no final action on those topics until the PSC completed the task of defining the ECR. This is because until the PSC declared its work on the ECR calculation complete, it could always go back and adjust the calculation to include other benefits or redefine the costs and benefits of the net metering program.

¶65 In other words, until the PSC presented its final ECR, we would not be able to definitively say what it included and what it excluded. Nor could we say what the PSC had considered until it stopped considering. This means that the question of what inputs the PSC would use to calculate the ECR and the question of the validity of what the PSC used to create the ECR calculation at all were in flux until it finished ruling on the motion for reconsideration. This makes the December Order intermediate with respect to the ECR Calculation Decisions. And intermediate orders are not final agency action.

¶66 This analysis does not change simply because the PSC announced—in the order partially denying rehearing—that it did not intend to revisit a number of decisions about the inputs it would use.[10] Vote Solar suggests that the PSC's representation meant that

---

[10] Vote Solar argues that the PSC dubbing the December Order "final" should be granted "significant weight" in analyzing whether it is final agency action. We recognize that it may be frustrating to parties that an agency's statement that an order is final is not determinative of finality. But, as we have stated, "agency decisions premised on pure questions of law are subject to non-deferential review for correctness." *Ellis-Hall Consultants v. Pub. Serv. Comm'n* 2016 UT 34, ¶ 27, 379 P.3d 1270. If we were to defer to an agency's conclusion about the finality of its order, we would, in essence, give the agency a disproportionate say in when our jurisdiction adheres.

the PSC had reached the end of the road on those issues it said were final, making them final agency action and fair game for review. This type of reasoning, however, would read "intermediate" out of the *Union Pacific* test. The focus should be on whether the issues will continue to play a role in decisions the PSC has yet to make and not on the PSC's declarations about whether it intends to rehear those issues. Here, the ECR Calculation Decisions were "preliminary, preparatory, procedural, or intermediate with regard to subsequent agency action" until the ECR calculation was set in April. *See Union Pac. R.R. Co.*, 2000 UT 40, ¶ 16.

### A. Proper Application of the Union Pacific Test Does Not Preclude Agency Orders from Ever Becoming Final Agency Action

¶67 Vote Solar pushes back against this conclusion by raising a policy concern. Vote Solar contends that if we conclude the December Order is intermediate, it will make it much more difficult to petition for review of agency actions. Vote Solar reasons that, if the existence of the April Order changing some inputs of the ECR calculation makes the December Order not "final agency action," then the existence of the August 2021 Order updating the ECR, or the other further orders in the docket, would make the April Order non-final and therefore unreviewable. Vote Solar predicts that this would render agency action forever unreviewable because the agency could continually move the goalposts, thereby never taking final agency action.

¶68 We see the issue, but it is one that is better understood as a mootness concern. Once the PSC settled on the formula it would use to calculate the ECR, we had final agency action.

¶69 We understand Vote Solar's argument that the PSC might later change the ECR calculation in a way that impacts the issues on review. That would not, however, retroactively shift the nature of what the PSC had decided from final to non-final. It might, however, render our review of the prior order moot.

¶70 We understand Vote Solar's concern that it might be difficult to seek review if the PSC changes its approach and moots a challenge. But the way to address this concern is not to expand the definition of final agency action, but to recognize that our jurisprudence allows us to, in certain circumstances, hear a mooted challenge. For example, an exception to mootness exists when an issue will "(1) affect the public interest, (2) be likely to recur, and

(3) because of the brief time that any one litigant is affected, be likely to evade review." *Widdison v. State*, 2021 UT 12, ¶ 14, 489 P.3d 158 (cleaned up).[11]

## II. RULING ON THE ECR CALCULATION DECISIONS WOULD DISRUPT THE ORDERLY PROCESS OF ADJUDICATION

¶71 The *Union Pacific* test also asks whether "administrative decisionmaking [has] reached a stage where judicial review will not disrupt the orderly process of adjudication." *Union Pac. R.R. Co. v. Utah State Tax Comm'n*, 2000 UT 40, ¶ 16, 999 P.2d 17. OCS argues that hearing a challenge to the December Order would disrupt the "orderly process of adjudication." OCS primarily argues that problems could arise if this court took jurisdiction over the December Order—which set an ECR—at the same time the PSC revisited that ECR on a motion for rehearing.

¶72 Vote Solar does not dispute that the PSC continued to calculate the ECR after it issued the December Order. But it contends that does not matter because the decisions it challenges on review were decided with finality in December 2020 and are separate issues from the components of the ECR decided in April 2021. Vote Solar argues that we could address some ECR components while the PSC continued its process on other ECR components without disrupting the orderly process of adjudication. We are not as sanguine as Vote Solar.

¶73 Vote Solar's petition for review of the December Order while the PSC was reconsidering the ECR created the potential for dueling orders. Should we conclude that the December Order is a final agency action, and then agree with Vote Solar on some of its arguments on review, the PSC would need to change its approach. Depending on how we ruled, the PSC might need to recalculate the ECR with a different set of inputs or perhaps even go back and do a different cost-benefit analysis of the net metering program. This hypothetical holding would also make the ECR that the PSC set in the April Order legally infirm because it is based on those inputs in the December Order and the decision that the cost-benefit analysis

---

[11] We offer no opinion on how we might rule on such an argument. We raise the potential argument to highlight that the concerns Vote Solar advances may raise the type of issues that animate our exception to mootness.

fulfills the PSC's statutory obligation. But Vote Solar did not seek review of that April Order.

¶74 This hypothetical would leave us with a decision from this court reversing the PSC's decision on some of the inputs it would use to calculate the ECR (or its approach to its statutory obligations) and a subsequent, unchallenged PSC decision calculating the ECR based on those now-reversed inputs (or the now erroneous approach). This type of result appears to have motivated the Legislature to only allow review of final agency action. This also exemplifies why the *Union Pacific* test considers the real-world impact of a challenge to help decide whether an order constitutes final agency action.

¶75 Vote Solar's petition for review of the December Order also creates the potential for disrupting the orderly decision-making process by limiting the options available to the PSC on reconsideration. If Vote Solar is right, and the December Order is reviewable as final agency action, the PSC would lose the ability to revisit any of the ECR components that it deemed final, even while it reconsiders other components of that same calculation. This is because the PSC would lose jurisdiction over any issue on review. So, while the PSC reconsidered the inputs to the ECR, it would be unable to revisit its previous decisions on those inputs even if it received testimony or evidence that prompted the need to go back and adjust them. This disruption to the process is avoided if we recognize that the December Order decisions on fulfilling the Net Metering Statute, using only cost-of-service costs and benefits, and adding integration costs to the ECR were non-final agency action.[12]

### III. THE DECEMBER ORDER CONSTITUTES FINAL AGENCY ACTION ON THE ECR OPERATION DECISIONS

¶76 In contrast to the ECR Calculation Decisions, the ECR Operation Decisions embody the PSC's final action on those issues. To start, the PSC's decisions to have ECR credits expire annually and to have the ECR calculation itself be updated annually were not "preliminary, preparatory, procedural, or intermediate with regard

---

[12] The OCS does not contest that the December Order meets the second prong of the *Union Pacific* test—that rights or obligations were determined by, or legal consequences flowed from, the Order. Since it is conceded and unbriefed, we express no view on the correctness of the assertion.

to subsequent agency action." *See Union Pac. R.R. Co. v. Utah State Tax Comm'n*, 2000 UT 40, ¶ 16, 999 P.2d 17. Neither of these decisions played any role in calculating the ECR in the April Order. Those decisions would apply the same to whatever the PSC decided with respect to the ECR Calculation Decisions. Thus, they were not intermediate, preliminary, or preparatory to any subsequent PSC action.

¶77 Nor will our review of those decisions create the potential to "disrupt the orderly process of adjudication." *See id.* We can determine if the PSC correctly decided whether to have the ECR credits expire annually and whether to update the ECR annually without impacting the ECR that the April Order set. Stated differently, the decision to have the credits expire would apply the same to whatever size credit rate the PSC's April Order set. Ditto the PSC's decision to reevaluate that credit rate every year.

¶78 Moreover, there is no evidence in the record before us that the PSC might have needed the ability to revisit the ECR Operation Decisions when it reheard questions about the ECR's calculation. On this record, we can conclude that we can hear the ECR Calculation Decisions without compromising the PSC's ability to decide the remaining issues or risking the possibility of competing and contradictory orders. The ECR Operation Decisions constitute final agency action under the *Union Pacific* framework.[13]

¶79 Because we have final agency action on the ECR Operation Decisions, we have jurisdiction to address the substance of Vote Solar's challenges.

---

[13] Let us be the first to recognize that our decision is unsatisfying because the *Union Pacific* test, as we apply it to the PSC's decisions here, requires parties to have a surplus of confidence in their ability to correctly analyze whether something is final agency action. Whether the result we reach is influenced by OCS conceding the second *Union Pacific* inquiry, a clunky *Union Pacific* test, or a need to have the Legislature define "final agency action" might be up for debate. But what could be beyond dispute is that our statute and current test fail to give us the certainty that we strive for in other rules governing the finality of orders and judgments. *See, e.g.*, UTAH R. APP. P. 4; UTAH R. CIV. P. 58A. We can anticipate that a future party might ask us to abandon or refine the *Union Pacific* test or ask the Legislature to better define "final agency action."

## IV. SUBSTANTIAL EVIDENCE SUPPORTS THE PSC'S DECISION TO ANNUALLY UPDATE THE ECR

¶80 Vote Solar argues that we should reverse the PSC's decision to annually update the ECR. Vote Solar's challenge on this issue presents two sub-issues: (1) whether Customer Generators and other non-power-generating residential customers constitute different classes of customers and (2) whether the ECR should update annually. Vote Solar first argues that the PSC is required to charge similarly situated customers the same rate unless there is substantial evidence of differences that necessitate a diverging rate. Vote Solar contends that the PSC violated this principle by treating Customer Generators differently than other ratepayers when it ordered an annual update to the ECR. Vote Solar further asserts that the PSC's determination that Customer Generators are not similarly situated to other ratepayers is not supported by substantial evidence.[14]

¶81 On the first sub-issue, the PSC does not contest the legal premise that it cannot treat similarly situated customers differently but contends that Customer Generators are not similarly situated to other ratepayers.[15]

¶82 As an initial matter, we agree with the parties that the basic legal principle is not in dispute. Utah Code section 54-3-8(1)(b) forbids the PSC from creating "unreasonable difference[s] as to rates . . . between classes of service." We discussed this principle in *Mountain States Legal Foundation v. Utah Public Service Commission*, 636 P.2d 1047 (Utah 1981). In *Mountain States*, Utah Power & Light Company created a discounted "senior citizen rate" for heads of household over the age of sixty-five. *Id.* at 1050. We stated that it "is

---

[14] Most of the time, Vote Solar frames its argument in terms of the PSC's decisions lacking substantial evidence. At a few points in its brief, Vote Solar parrots the Administrative Procedure Act's language and calls the decisions "arbitrary, capricious, and lacking substantial evidence." (Citing UTAH CODE § 63G-4-403(4).) Because the substance of Vote Solar's arguments focuses on the evidence underlying the decisions, we stick with that framing.

[15] The PSC and RMP additionally argue that, contrary to Vote Solar's contention, non-power-generating residential customers are also subject to annually updating rates. Because we dispose of Vote Solar's argument on other grounds, we need not reach the substance of that argument.

axiomatic in rate making that utilities are barred from treating persons similarly situated in a dissimilar fashion," and we struck the preferred rate for seniors. *Id.* at 1052, 1057–58.

¶83 We did not hold that the PSC is powerless to recognize that certain of its constituents can be grouped into categories. To the contrary, we stated that "[r]easonable classifications between consumers may be made, but there must be adequate findings of fact, supported by evidence, which demonstrate a rational basis for the classification." *Id.* at 1052.

¶84 Vote Solar nevertheless argues that the PSC must require RMP to treat Customer Generators the same as other customers when it comes to annually updating their rates because there is not substantial evidence supporting a decision to treat the two groups differently.

¶85 This presents a fact-like mixed question that we review deferentially.[16] *See Randolph v. State*, 2022 UT 34, ¶ 24, 515 P.3d 444. Such questions generally arise when "application of a legal concept is highly fact dependent and variable. Or when the factual scenarios presented are so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out." *Id.* (cleaned up).

¶86 Although the Administrative Procedures Act does not give us the standard of review, it defines the deference we provide to an agency's factual findings. *See* UTAH CODE § 63G-4-403(4)(g). We look to see if there is substantial evidence to support the agency's decision. *See id.* "A decision is supported by substantial evidence if there is a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8, 345 P.3d 1242 (cleaned up).

¶87 The problem Vote Solar faces is that ample evidence existed to permit the PSC to conclude that Customer Generators are not similarly situated to other customers. The PSC pointed out in its October Order that "[ECR] updates [do] not directly impact the rates an RMP customer pays for electricity." The PSC also noted that if

---

[16] The Administrative Procedures Act does "not expressly mandate" the standard of review to use in this circumstance, so we revert to our traditional standard of review. *Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 18, 308 P.3d 461; *see also* UTAH CODE § 63G-4-403.

Customer Generators wanted a fixed long-term rate in exchange for solar power, they could become a commercial generator under Schedule 37, an option that is not available to customers who do not sell energy to RMP. Moreover, multiple experts testified that updating the ECR annually could ensure costs would not be shifted onto non-power-generating residential RMP customers.

¶88 Simply stated, the evidence before the PSC allowed it to find that there is a difference between a group of customers who buy power and a group of customers who both buy and sell power.

¶89 Vote Solar additionally contends that the PSC's finding that the ECR should be updated annually is unsupported by substantial evidence. This sub-issue presents a question of fact, and, as explained above, we review an agency's factual findings for substantial evidence. *See* UTAH CODE § 63G-4-403(4)(g).

¶90 The PSC points to evidence before it that annually updating the ECR would "introduce volatility and uncertainty" into the returns on solar panel procurement and thus disincentivize investment. Vote Solar makes a compelling case that there was evidence before the PSC that might have supported a different conclusion.

¶91 But that is not the test to set aside the PSC's factual findings. When we conduct a "substantial evidence review, we do not reweigh the evidence and independently choose which inferences we find to be the most reasonable." *Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8 (cleaned up). Rather, "we defer to an administrative agency's findings because when reasonably conflicting views arise, it is the agency's province to draw inferences and resolve these conflicts." *Id.* (cleaned up).

¶92 Here, the PSC relied on evidence from multiple experts that failure to update the ECR annually would risk imposing higher rates on non-Customer Generators. Robert Meredith, the Director of Pricing and Cost of Service at PacifiCorp, RMP's parent company, testified that updating the ECR annually would ensure that the program's costs would not shift onto customers who did not sell power back to RMP. Another RMP witness, Daniel MacNeill, similarly testified that if the PSC did not regularly update the ECR, ratepayers who did not participate in the program would pay higher rates. MacNeill also posited that annual updates would best ensure the ECR's continued accuracy.

¶93 Vote Solar has demonstrated that there was conflicting evidence before the PSC. Vote Solar has not, as it must to prevail,

demonstrated that the PSC's decision was not supported by substantial evidence. We affirm the PSC's decision to update the ECR annually.

## V. VOTE SOLAR HAS NOT SHOWN THAT THE PSC'S DECISION TO HAVE ECR CREDITS EXPIRE ANNUALLY WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

¶94 Vote Solar asserts that the PSC's decision to allow ECR credits to expire annually was not supported by substantial evidence. Vote Solar argues that the PSC's only justification for annual expiration was to prevent "oversizing"—i.e., Customer Generators purchasing generating systems far beyond their needs in hopes of not just offsetting their own electric use but also making money selling power to RMP. Vote Solar further argues that this conclusion was faulty because the record does not support a conclusion that allowing credits to roll over from year to year would incentivize Customer Generators to oversize.

¶95 It bears noting, as the PSC did, that annual expiration of credits existed under the prior net metering program. The PSC nevertheless recognized that there was a legitimate policy question concerning credit expiration. The PSC stated that "the ECR should" disincentivize oversizing.

¶96 But the PSC did not, as Vote Solar claims, find that annual expiry was necessary to prevent oversizing. Rather, the PSC concluded that it had two options: "(1) continue annual expiration . . . and consider later whether the data . . . warrant elimination of the expiration" or "(2) eliminate annual expiration now and re-implement it if the empirical data warrant that action."

¶97 The PSC chose the first option because, as it explained in the December Order, it concluded that was "more in the public interest and less likely to result in unexpected disruptions to" Customer Generators. Vote Solar does not mount a direct challenge to this conclusion.

¶98 We reverse an agency's factual findings if they are not supported by substantial evidence. *See* UTAH CODE § 63G-4-403(4)(g). Since Vote Solar has not directly addressed the PSC's wait-and-see approach that continued the practice of annual credit expiration that had been the practice for years, we are not well positioned to say there was not substantial evidence supporting the PSC's decision. We therefore affirm the PSC's decision that ECR credits will expire annually.

**CONCLUSION**

¶99 The December Order from which Vote Solar seeks review addressed a variety of issues with respect to the creation and calculation of an ECR. That order did not constitute "final agency action" within the meaning of the Utah Administrative Procedures Act with respect to the ECR Calculation Decisions. This means we lack jurisdiction to hear Vote Solar's challenges concerning the PSC's statutory burden to analyze the costs and benefits of net metering, the PSC's decision to only analyze cost-of-service costs and benefits when it created the ECR, and the PSC's decision that integration costs should be included in the ECR calculation. We therefore lack jurisdiction over Vote Solar's petition for review as to these issues and dismiss.

¶100 The December Order was "final agency action" with respect to the ECR Operation Decisions. This means we have jurisdiction to hear Vote Solar's challenges to the decision to annually update the ECR and the decision to have unused credits expire annually. But we hold that the PSC had substantial evidence before it to support those decisions. We affirm.

———————————